[No. A124920. First Dist., Div. Five. Feb. 22, 2010.]

INTERSTATE FIRE AND CASUALTY INSURANCE COMPANY, Plaintiff and Appellant, v.
CLEVELAND WRECKING COMPANY, Defendant and Respondent.

24

**COUNSEL**

Kenney & Markowitz and David W. Gordon for Plaintiff and Appellant.

Seyfarth Shaw, Lawrence E. Butler and Jonathan A. Braunstein for Defendant and Respondent.

---

**OPINION**

**NEEDHAM, J.**—Interstate Fire and Casualty Insurance Company (Interstate) appeals from a judgment entered after the court sustained, without leave to amend, a demurrer to Interstate's amended complaint against Cleveland Wrecking Company (Cleveland). Interstate contends the court erred because (1) its subrogation complaint, based on its insured's contractual indemnification claim against Cleveland, was not barred by Cleveland's good faith settlement in the underlying litigation; and (2) Cleveland's equities were not equal to or superior to those of Interstate as a matter of law. We agree with Interstate, and the judgment and the order sustaining the demurrer will be reversed.

## I. *FACTS AND PROCEDURAL HISTORY*

We derive the relevant facts from the allegations of the operative pleading, Interstate's first amended complaint.

### A. *The Parties and the Underlying* Frisby *Litigation*

Webcor Construction, Inc. (Webcor), was the general contractor for a construction project in San Francisco. Cleveland Wrecking Company was a subcontractor responsible for certain demolition work. Delta Steel Erectors (Delta) was a subcontractor engaged in the installation of steel stairways.

Cleveland and Delta each entered into similar subcontracts with Webcor, by which they undertook to indemnify Webcor for liability arising out of their work and to procure general liability insurance with Webcor as an additional insured.

In particular, section 15.1.1 of the agreement between Webcor and Cleveland (the Agreement) obligated Cleveland to indemnify "Contractor" (Webcor), to the extent set forth therein, from "claims, demands, causes of action, damages, costs, expenses, actual attorney's fees, losses or liability, in law or in equity, of every kind and nature whatsoever ('Claims') arising out of or in connection with Subcontractor's operations to be performed under this Agreement for, but not limited to . . . Personal injury . . . caused or alleged to be caused in whole or in part by any negligent act or omission of Subcontractor [Cleveland]." Under section 15.1.2, Cleveland was required to, at its "own cost, expense and risk, defend all Claims as defined in Section 15.1.1" by third parties, pay any judgment, and reimburse Webcor and certain others for legal expenses they incurred.

Although both Cleveland and Delta had agreed to procure liability insurance with Webcor as an additional insured, only Delta complied with the

obligation. Interstate issued to Delta a written commercial general liability policy in effect from July 1, 2003, to July 1, 2004. Webcor was an additional insured.

### 1. *Frisby's Injury*

On April 29, 2004, Cleveland's employees were moving debris to an area where it could be loaded onto trucks. They had been warned that Delta's employees were working in areas below them, and that Delta's employees were being showered by debris dislodged by Cleveland's operations. One of Delta's employees, ironworker Thelbert Allen Frisby (Frisby), was working in a stairwell below an opening in the floor on which Cleveland's employees were moving the debris.

To move the debris, Cleveland's Bobcat operator drove a loader bucket into the pile of debris, and then backed up with the load to move it. This repeated process moved the pile of debris closer to the opening and ultimately into a slab grabber, which became dislodged and fell into the opening where Frisby was working. The slab grabber struck Frisby and caused significant injury.

### 2. *Frisby's Complaint*

Frisby filed a workers' compensation claim against his employer, Delta. In addition, he filed a lawsuit against Webcor and Cleveland in San Francisco Superior Court.

In *Frisby v. Cleveland Wrecking Co.* (Super. Ct. S.F. County, 2008, No. CGC-05-440636), Frisby sought to recover for personal injuries he sustained in the accident, alleging a cause of action against Cleveland for negligence and causes of action against Webcor for negligence, premises liability, and negligent provision of unsafe equipment. Among other things, Frisby alleged that Cleveland breached its duty to perform work in a safe manner by failing to use reasonable care to prevent damage to Frisby, who it knew or should have known was working in an area below.

### 3. *Webcor's Tender*

Webcor tendered its defense and indemnification to Cleveland pursuant to the terms of the Agreement. Cleveland rejected the tender. Webcor also tendered its defense and indemnification to Interstate pursuant to the terms of the Interstate-Delta policy. Interstate accepted it.

### 4. *Webcor's Cross-complaint*

Webcor filed a cross-complaint against Cleveland (and Delta) for express indemnification, equitable indemnification, and breach of contract. Webcor

thereafter voluntarily dismissed its equitable indemnity and contribution claims with prejudice, but dismissed its cause of action for express indemnity and breach of contract without prejudice. The parties expressly reserved their rights with respect to an Interstate subrogation claim in a separate action.

### 5. *Settlement of* Frisby

In July 2007, Webcor and Frisby entered into a settlement by which Webcor would pay Frisby $575,000 and Frisby would dismiss his claims against Webcor. The court approved their agreement as a good faith settlement under Code of Civil Procedure section 877.6. Interstate funded the $575,000 settlement payment and additionally paid over $152,000 for the attorney fees and costs incurred in defending Webcor against Frisby's claims.

Cleveland also entered into a settlement with Frisby, which the court approved as a good faith settlement as well. (Code Civ. Proc., § 877.6.)

### B. *The Subrogation Litigation*

In the matter before us, Interstate filed a complaint for subrogation against Cleveland, alleging that Cleveland had breached its contract with Webcor by failing to defend and indemnify Webcor in *Frisby*.

Cleveland filed a general demurrer, contending that Interstate was not entitled to subrogation as a matter of law, because it was not in a superior equitable position to Cleveland, and because Cleveland's alleged breach of contract had not caused any damage. The court sustained the demurrer with leave to amend, allowing Interstate to allege how Cleveland's tortious conduct gave rise to the loss.

In its first amended complaint, Interstate realleged Cleveland's breach of its agreement to defend and indemnify Webcor. Interstate further alleged that Cleveland's negligence was a proximate cause of Frisby's injuries, and that Cleveland had violated its subcontract by failing to obtain insurance covering Webcor. Interstate sought judgment for all amounts it spent to defend against and settle the claims against Webcor in *Frisby*, alleging it was subrogated to Webcor's claims against Cleveland for breach of its express contractual indemnity obligation. Attached to the first amended complaint were the Webcor-Cleveland subcontract and the Interstate-Delta policy, provision 8 of which set forth a subrogation clause: "If the insured has rights to recover all or part of any payment we have made under this Coverage Part, those rights are transferred to us. The insured must do nothing after loss to impair them. At our request, the insured will bring 'suit' or transfer those rights to us and help us enforce them."

Cleveland filed a general demurrer, again arguing that Interstate lacked the superior equities required for subrogation and that Webcor did not incur damages by Cleveland's alleged breach of the indemnification provision. Cleveland requested judicial notice of files and records including the good faith settlement order and dismissal in *Frisby*.

The court sustained Cleveland's demurrer without leave to amend. By written order, the court explained: "The good faith settlement in the *Frisby* case cut off Webcor'[s] ability to sue Cleveland for indemnity or contribution for its alleged negligent conduct. At the same time, Webcor has no claim against Cleveland for Cleveland's breach of its duty to defend Webcor because Webcor has sustained no damages as a consequence of the breach. It is for this reason that Interstate's equitable position is not superior to Cleveland's equitable position. [Citations.]"

A judgment of dismissal was entered, and this appeal followed.

## II. DISCUSSION

Interstate contends the trial court erred in sustaining the demurrer for two reasons: (1) the good faith settlement between Cleveland and Frisby did not bar Interstate from proceeding against Cleveland on a claim for breach of an express contractual indemnification provision; and (2) the court erred in concluding that Webcor suffered no damages from Cleveland's alleged breach of the Agreement and that Interstate's equitable position was therefore not superior to Cleveland's.

In reviewing an order sustaining a demurrer, we assume the truth of all well-pleaded material facts, as well as those facts that may be implied or inferred from the express allegations. (*Blank v. Kirwan* (1985) 39 Cal.3d 311, 318 [216 Cal.Rptr. 718, 703 P.2d 58].) We consider as well any matters that may be judicially noticed. (*Ibid.*) We then determine de novo whether the allegations stated any cause of action as a matter of law. (*Ibid.*) Where, as here, the demurrer is sustained without leave to amend, we determine if necessary whether the plaintiff established a reasonable possibility that the defect in the complaint could be cured by amendment. (*Zelig v. County of Los Angeles* (2002) 27 Cal.4th 1112, 1126 [119 Cal.Rptr.2d 709, 45 P.3d 1171].)

After a brief review of the nature of subrogation, we address the parties' contentions.

### A. Subrogation

Subrogation is the "substitution of another person in place of the creditor or claimant to whose rights he or she succeeds in relation to the debt

or claim." (*Fireman's Fund Ins. Co. v. Maryland Casualty Co.* (1998) 65 Cal.App.4th 1279, 1291 [77 Cal.Rptr.2d 296].) "In the case of insurance, subrogation takes the form of an insurer's right to be put in the position of the insured in order to pursue recovery from third parties legally responsible to the insured for a loss which the insurer has both insured and paid. [Citations.]" (*Id.* at pp. 1291–1292.) "The subrogated insurer is said to ' "stand in the shoes" ' of its insured, because it has no greater rights than the insured and is subject to the same defenses assertable against the insured. Thus, an insurer cannot acquire by subrogation anything to which the insured has no rights, and may claim no rights which the insured does not have." (*Id.* at p. 1292.)

■ Usually, a general liability insurer that has paid a claim to a third party on behalf of its insured may have an equitable right of subrogation against (1) other parties who contributed to the harm suffered by the third party (joint tortfeasors) under an equitable indemnification theory, and (2) other parties who are legally liable to the insured for the harm suffered by the third party (such as by an indemnification agreement) under a contractual indemnity theory. As we shall see, a good faith settlement will preclude claims based on an equitable indemnity theory but not claims based on a contractual indemnity theory, yet subrogation may not be obtained even as to contractual indemnity claims unless the insurer is in an equitable position superior to that of the defendant.

B. *Effect of Good Faith Settlement*

■ A determination that a settlement was made in good faith bars the nonsettling defendants from asserting claims against the settling tortfeasor for equitable comparative contribution and partial or comparative indemnity. (Code Civ. Proc., § 877.6, subd. (c).) Because an insurer stands in the shoes of its insured in a subrogation action, the insurer cannot pursue those types of indemnity claims against the settling tortfeasor. (See *Wilshire Ins. Co. v. Tuff Boy Holding, Inc.* (2001) 86 Cal.App.4th 627, 631–633, 640 [103 Cal.Rptr.2d 480].)

However, a good faith settlement order does not bar a nonsettling tortfeasor from asserting an indemnification claim against the settling defendants based on an express contract. (*Bay Development, Ltd. v. Superior Court* (1990) 50 Cal.3d 1012, 1031–1032 [269 Cal.Rptr. 720, 791 P.2d 290] [good faith settlement bars claim for implied contractual indemnity, but not express contractual indemnity]; *Plant Insulation Co. v. Fibreboard Corp.* (1990) 224 Cal.App.3d 781, 790 [274 Cal.Rptr. 147]; *C. L. Peck Contractors v. Superior Court* (1984) 159 Cal.App.3d 828, 834 [205 Cal.Rptr. 754] ["We hold that an indemnity claim against a codefendant based on express contract survives a

good faith [Code of Civil Procedure,] section 877.6 settlement."].) Because an insurer stands in the shoes of its insured, the insurer can pursue a cause of action against the settling tortfeasor for breach of an express contractual indemnification clause.

Interstate's first amended complaint against Cleveland sets forth a claim for express contractual indemnity, based on Cleveland's refusal to defend and indemnify Webcor under the terms of the Agreement. The claim is not barred by the good faith settlement determination.

Cleveland argues that Interstate's claim for express contractual indemnity does not seek damages resulting from Cleveland's alleged contractual breach, but rather seeks to recover tort damages resulting from Cleveland's alleged negligence, a liability precluded by the good faith settlement order under Code of Civil Procedure section 877.6. Cleveland is incorrect. As discussed *post*, Interstate's allegations concerning Cleveland's negligence pertains neither to the legal theory of the indemnity claim nor to the amount or nature of the damages alleged, but to the respective equities of the parties. The good faith settlement does not bar Interstate from pursuing its cause of action for express contractual indemnification against Cleveland.[1]

## C. *Elements of Subrogation*

"The essential elements of an insurer's cause of action for equitable subrogation are as follows: [1] the insured suffered a loss for which the defendant is liable, either as the wrongdoer whose act or omission caused the loss or because the defendant is legally responsible to the insured for the loss caused by the wrongdoer; [2] the claimed loss was one for which the insurer was *not* primarily liable; [3] the insurer has compensated the insured in whole or in part for the same loss for which the defendant is primarily liable; [4] the insurer has paid the claim of its insured to protect its own interest and not as a volunteer; [5] the insured has an existing, assignable cause of action against the defendant which the insured could have asserted for its own benefit had it not been compensated for its loss by the insurer; [6] the insurer has suffered damages caused by the act or omission upon which the liability of the defendant depends; [7] justice requires that the loss be entirely shifted from

---

[1] The trial court did not expressly rule that the good faith settlement barred Interstate from proceeding against Cleveland on a claim for breach of an express indemnification provision. It ruled that the good faith settlement "cut off Webcor'[s] ability to sue Cleveland for indemnity or contribution *for its alleged negligent conduct*." (Italics added.) To the extent the court meant that Interstate's new allegations about Cleveland's tortious conduct did not entitle it to subrogate to any claim for *equitable* indemnification, it was correct. However, the fact that Interstate was clearly purporting to subrogate to Webcor's right to *contractual* indemnification required the trial court—and now requires this court—to determine whether subrogation is unavailable as a matter of law on other grounds.

the insurer to the defendant, whose equitable position is inferior to that of the insurer; and [8] the insurer's damages are in a liquidated sum, generally the amount paid to the insured." (*Fireman's Fund Ins. Co. v. Maryland Casualty Co., supra*, 65 Cal.App.4th at p. 1292.)

Cleveland contends that all but the fourth and eighth elements are not met, based largely on its specious contention that Webcor suffered no damages from Cleveland's alleged breach of the Agreement. We address each of the disputed elements in turn.

 1. *The Insured Webcor Suffered a Loss for Which Defendant Cleveland Is Liable*

According to the allegations of the first amended complaint, Webcor suffered a loss in defending against the *Frisby* litigation and incurring the *Frisby* settlement. It is further alleged that Cleveland is legally responsible to Webcor for that loss under the terms of the indemnification provision in the Agreement. These allegations satisfy this first element of a subrogation claim.

Cleveland contends Webcor did not actually suffer any loss, because Interstate paid the costs of defending against and settling Frisby's claims. Because Interstate paid these costs, Cleveland concludes, Interstate cannot subrogate to recover them.

■ Cleveland's position is untenable. The only reason Webcor had no out-of-pocket expense was because its insurer, now seeking subrogation, made the payment. Under Cleveland's view, no insurer could *ever* state a cause of action for subrogation in order to recover amounts it paid on behalf of its insured, because of the very fact that it had paid amounts on behalf of its insured. Not only is this illogical, it contradicts decades of cases consistently holding that an insurer may be equitably subrogated to its insured's indemnification claims. (See, e.g., *Rossmoor Sanitation, Inc. v. Pylon, Inc.* (1975) 13 Cal.3d 622, 634 [119 Cal.Rptr. 449, 532 P.2d 97] (*Rossmoor*) [landowner's insurer was subrogated to the landowner's right of express contractual indemnification against a contractor, where the insurer had paid the judgment for the landowner]; *Truck Ins. Exchange v. County of Los Angeles* (2002) 95 Cal.App.4th 13, 27 [115 Cal.Rptr.2d 179] (*Truck*) [hospital's insurer, which incurred defense costs on hospital's behalf, was subrogated to hospital's cause of action against county for express contractual indemnity].)[2] Indeed, the insurer's right to subrogation does not even arise *unless* it has paid for its insured's loss. (*Smith v. Parks Manor* (1987) 197

---

[2] Cleveland contends that *Truck* and *Rossmoor* are inapplicable because they did not involve good faith settlements. However, Cleveland does not explain why this distinction would make any difference. A good faith settlement might bar an equitable indemnity claim, but not an

Cal.App.3d 872, 878–879 [243 Cal.Rptr. 256] [where insurer reached a settlement agreement on behalf of its insured to pay the injured parties, the insured at that point had suffered a loss, the insurer was subrogated to the insured's rights upon payment of the settlement, and it was "not necessary for [the insured] actually to pay the settlement sum out-of-pocket, then secure reimbursement, to suffer a loss"].)

██ Cleveland's argument apparently stems from a faulty reading of *Bramalea California, Inc. v. Reliable Interiors, Inc.* (2004) 119 Cal.App.4th 468 [14 Cal.Rptr.3d 302] (*Bramalea*) and *Patent Scaffolding Co. v. William Simpson Constr. Co.* (1967) 256 Cal.App.2d 506 [64 Cal.Rptr. 187] (*Patent Scaffolding*). Cleveland cites these cases for the proposition that the collateral source rule (which permits a plaintiff to recover against tortfeasors even though it has been compensated by its insurer) applied only to a plaintiff's tort claims, and not to contract claims like the one asserted by Interstate. The collateral source rule, however, pertains to whether an *insured* may recover on its own behalf. (*Bramalea*, at p. 473 [insured could not recover in contract from third party where loss compensated by insurer].) It has nothing to do with whether the *insurer* can recover in subrogation on its insured's contractual indemnification claim. In fact, after the court in *Patent Scaffolding* discussed, as an unnecessary aside, that the insured could not invoke the collateral source rule, the court returned to the subrogation issue before it: "*Insurers' Equitable Subrogation* [¶] The fact alone that Patent could not recover from Simpson because Patent suffered no loss *does not defeat the insurers' subrogation rights*." (*Patent Scaffolding*, at p. 511, second italics added.)[3]

2. *The Loss Was One for Which the Insurer Was Not Primarily Liable*

The "loss," for purposes of this analysis, is the amount incurred in defending Webcor and settling Frisby's claims against Webcor. The liability for this amount was arguably on the shoulders of Cleveland (under the Agreement), Delta (under the Webcor-Delta contract), and Interstate (under the Interstate-Delta policy, with Webcor as an additional insured). In its first amended complaint, however, Interstate alleged: "*Cleveland is solely* responsible for the costs of defense and settlement of Frisby's claims against

express contractual indemnity claim. Furthermore, even though Webcor incurred its loss by way of a good faith settlement, it still incurred its loss.

[3] Another way to look at the situation is this: Interstate's payment to Frisby and payment for Webcor's defense simultaneously satisfied both the first element of a subrogation claim (Webcor's loss) *and* the third element (Interstate's reimbursement of Webcor for the loss). Cleveland's insistence that Webcor suffered no loss because Interstate paid Frisby, and Interstate therefore suffered no loss because it stands in the shoes of its insured, is circular and erroneous.

Webcor." (Italics added.) Cleveland does not demonstrate that another allegation, or any other matter subject to consideration at the demurrer stage, establishes that Interstate was primarily liable for the loss.

Cleveland's only argument on this point is that Delta and Cleveland did not bear "more or less primary liability than the other," since both of them had entered into contracts by which they were obligated to defend and indemnify Webcor. Cleveland has not demonstrated why that would make Interstate *primarily* liable. For purposes of Cleveland's demurrer, this element of subrogation was met.

### 3. *The Insurer Compensated the Insured for the Loss*

Interstate compensated Webcor for the defense and settlement in *Frisby*, by paying Frisby and Webcor's attorneys. Cleveland nonetheless argues that Interstate made those payments because of its obligations under the Interstate-Delta insurance policy, and not because of Cleveland's contractual breach of the indemnification provision or its alleged negligence in causing Frisby's injuries. However, regardless of why Interstate made the payments, it made the payments. Indeed, it can always be said that an insurer has compensated its insured because it had to under its insurance policy. Cleveland provides no authority for its suggestion that subrogation must be denied on this ground.

### 4. *The Insured Has a Cause of Action Against the Defendant*

This element asks whether Webcor would have an assignable cause of action against Cleveland "had it not been compensated for its loss" by Interstate. (*Fireman's Fund Ins. Co. v. Maryland Casualty Co., supra*, 65 Cal.App.4th at p. 1292.) The first amended complaint satisfies this element, alleging that, under the terms of the Webcor-Cleveland subcontract, Cleveland had a duty to defend and indemnify Webcor, and it breached that duty by failing to do so. Webcor could have pursued a cause of action against Cleveland had Interstate not made the payments, and there is no contention the cause of action is of a type that cannot be assigned.

Cleveland urges that Webcor does not have an existing cause of action against Cleveland because Webcor has already been fully compensated by Interstate. This argument is of course wrong, not only for the reasons stated above, but also because it is directly contradicted by the wording of the subrogation element itself. The element—even as described in Cleveland's own brief—asks whether the insured has a cause of action against the defendant which it could have asserted "had it *not* been compensated for its loss by the insurer." (*Fireman's Fund Ins. Co. v. Maryland Casualty Co., supra*, 65 Cal.App.4th at p. 1292, italics added.)

### 5. *The Insurer Suffered Damages Arising from the Defendant's Act or Omission*

Interstate has suffered damages by Cleveland's failure to indemnify Webcor for its costs of defense and settlement payment to Frisby. If Cleveland had made the payments, Interstate would not have had to make them.

Cleveland argues that Interstate has not actually suffered damages, because Interstate was obligated to defend and indemnify Webcor anyway under the terms of the insurance policy. However, this merely reflects Cleveland's view that Interstate should have to pay, while Webcor alleges that Cleveland should pay. The fact that both Interstate and Cleveland were contractually obligated to defend and indemnify Webcor in the *Frisby* litigation gives rise to the question of which of them is in a superior equitable position to the other. We address that issue next.[4]

### 6. *The Insurer's Superior Equitable Position*

This element asks whether it is fair to shift the entire loss from Interstate to Cleveland, because Interstate's equitable position is superior to Cleveland's. Based on the allegations of the first amended complaint in this case, it can reasonably be inferred that Interstate's equitable position is superior to that of Cleveland.

Cleveland, which had the burden in its demurrer to show that Interstate cannot establish superior equities as a matter of law, relies on a number of cases including *Meyers v. Bank of America etc. Assn.* (1938) 11 Cal.2d 92 [77 P.2d 1084] (*Meyers*) and *Patent Scaffolding, supra*, 256 Cal.App.2d 506. We summarize these two cases as a starting point, and conclude that neither they nor the other cases on which Cleveland relies support Cleveland's arguments.

In *Meyers*, an office manager obtained possession of checks payable to Meyers, forged them for his own use, and negotiated them with an individual defendant. The individual defendant in turn deposited them with the defendant bank, which accepted them. (*Meyers, supra*, 11 Cal.2d at p. 93.) Meyers was indemnified for his loss under a bond issued by his surety, and the surety pursued the bank in subrogation. (*Id.* at p. 94.) The court ruled that the surety could not recover: "[T]he right to maintain an action of this kind and to a

---

[4] At oral argument, Cleveland noted that Interstate's insurance was stated to be primary insurance. The specification of *insurance* as primary with respect to other potential competing insurance policies does not in itself mean that the insurer's obligation to the insured kicks in before or notwithstanding the contractual *indemnification* obligations of a third party such as Cleveland.

recovery thereunder involves a consideration of, and must necessarily depend upon the respective equities of the parties. Here, the indemnitor [the surety company] has discharged its primary contract liability. It has paid what it contracted to pay, and has retained to its own use the premiums and benefits of such contract. It now seeks to recover from the bank the amount thus paid. It must be conceded that the bank is an innocent third party, whose duty to the employer was based upon an entirely different theory of contract [not disclosed in the opinion], with which the indemnitor was not in privity. *Neither the indemnitor nor the bank was the wrongdoer*, but by independent contract obligation each was liable to the employer. In equity, it cannot be said that the satisfaction by the bonding company of its primary liability should entitle it to recover against the bank upon a totally different liability. The bank, not being a wrongdoer, but in the ordinary course of banking business, paid money upon these checks, the genuineness of which it had no reason to doubt, and from which it received no benefits. The primary cause of the loss was the forgeries committed by the employee, whose integrity was at least impliedly vouched for by his employer to the bank. We cannot say that as between the bank and the paid indemnitor [the surety], the bank should stand the loss." (*Id.* at pp. 102–103, italics added.)

*Meyers* is not on point. In that case, the bank played no part in the underlying loss, and there is no indication that the bank's alleged contractual liability to Meyers was an express contractual obligation to indemnify Meyers for such a loss. The alleged facts in the matter before us are just the opposite: Cleveland *did* allegedly contribute to the underlying loss (by negligently causing Frisby's injuries), and Cleveland *was* allegedly contractually obligated to indemnify Webcor for the loss.

A little closer to our case, but still plainly distinguishable, is *Patent Scaffolding*. There, a subcontractor (Patent) was hired by a general contractor (Simpson) to perform certain work on a building. (*Patent Scaffolding, supra*, 256 Cal.App.2d at p. 508.) Their contract required Simpson to obtain fire insurance on Patent's property at the job site, but Simpson failed to do so. A fire of unknown origin destroyed Patent's property. Patent's own fire insurers paid Patent for the loss, and then sought to subrogate to Patent's rights against Simpson for the latter's failure to obtain the insurance. The trial court permitted subrogation, finding that Simpson had agreed not only to obtain fire insurance but also to indemnify Patent against fire loss (despite the absence of an express indemnification provision in the contract). (*Id.* at pp. 508–509.)

The Court of Appeal reversed, holding that the insurers were not entitled to subrogation because Simpson did not cause the fire and the insurers were merely paying a loss that they had agreed to insure. The court explained:

"The insurers' loss was not caused by Simpson's failure to get insurance or to indemnify Patent. The insurers' loss was caused by the fire, the very risk which each assumed, and Simpson's failure to perform its contractual duty had nothing to do with the fire." (*Patent Scaffolding, supra*, 256 Cal.App.2d at p. 512.) The court held: when "two parties are contractually bound by independent contracts to indemnify the same person for the same loss, the payment by one of them to his indemnitee does not create in him equities superior to the nonpaying indemnitor, justifying subrogation, if the latter did not cause or participate in causing the loss." (*Id.* at p. 514.)

Under *Patent Scaffolding* and its progeny, Cleveland urges, Interstate is precluded from subrogation. Specifically, Cleveland argues, Interstate's loss was not caused by Cleveland's failure to defend, indemnify, or obtain insurance for Webcor, but by the lawsuit Frisby brought for his injuries at the job site, which was one of the specific risks that Interstate accepted premiums to cover.

*Patent Scaffolding* supports neither Cleveland's argument nor the trial court's decision in this case, for three reasons: (1) *Patent Scaffolding* did not involve a situation where, as here, the defendant *was* alleged to have caused the loss; (2) even where the defendant has not caused the loss, the equities may support the insurer where, as here, the defendant expressly promised to indemnify (not just to obtain insurance) in a contract related to the project from which the underlying loss occurred; and (3) the insurer's receipt of premiums to cover the type of loss that occurred, although a factor to be considered, does not preclude it from being in an equitably superior position to another party that contractually agreed to indemnify.

### a. Additional allegations that Cleveland caused the loss

Unlike the proposed indemnitor in *Patent Scaffolding*, Cleveland is not only alleged to be liable for the loss under a contractual provision, it is also alleged to have *caused* the loss. Cleveland's alleged negligence toward Frisby is relevant to the respective equities of Interstate and Cleveland.

Instructive in this regard is *Pylon, Inc. v. Olympic Ins. Co.* (1969) 271 Cal.App.2d 643 [77 Cal.Rptr. 72] (*Pylon*), decided just two years after *Patent Scaffolding*. The court in *Pylon* stated: "The holding in the *Patent Scaffolding* case does not constitute a rule applicable to every situation in which an insurer of an indemnitee seeks to hold the contractor-indemnitor on an indemnity contract." (*Pylon*, at p. 651.) The *Pylon* court cited our Supreme Court's decision in *Harvey Machine Co. v. Hatzel & Buehler, Inc.* (1960) 54 Cal.2d 445 [6 Cal.Rptr. 284, 353 P.2d 924], in which the defendants had agreed in a construction contract to indemnify a landowner for any liability

imposed against the landowner, including for injuries to the defendants' employees. One of the defendants' employees was thereafter injured and sued the landowner. The landowner *and its liability insurance carrier* sued the defendants; defendants were held obligated to indemnify the plaintiffs under the *contractual* indemnification provision. The *Pylon* court observed: "The *Harvey Machine Co.* case clearly holds that the insurance carrier of an indemnitee is subrogated to the right of the latter to obtain indemnification for loss paid by the carrier from *an indemnitor whose active negligence, operating concurrently with the negligence of the indemnitee, caused the loss.*" (*Pylon, supra,* 271 Cal.App.2d at p. 652, italics added.) *Pylon,* therefore, teaches that an insurer is subrogated to its insured's express contractual indemnity claim against a party who contributed toward the underlying loss, despite *Patent Scaffolding.* That is the situation alleged here.

Of additional and much more recent guidance is *Truck, supra,* 95 Cal.App.4th 13. There, a county and a hospital (Santa Marta) entered into an agreement by which Santa Marta would provide services for patients referred by the county. The county agreed, among other things, to refer only low-risk patients and further agreed to indemnify Santa Marta for claims or damages. (*Id.* at p. 16.) The county later referred a high-risk patient, Panduro, to Santa Marta, who was injured, as was her baby, during a breech birth. The Panduros sued the county and Santa Marta for her injuries. (*Ibid.*) The county refused to defend Santa Marta, so Santa Marta's insurer (Truck) provided a defense. (*Id.* at p. 17.) The jury found that the county was negligent in causing the Panduros' injuries, but Santa Marta was not. (*Ibid.*) Truck thereafter sued the county in subrogation, based on the county's contractual obligation to indemnify and defend Santa Marta in the medical malpractice action. (*Id.* at p. 18.)

On appeal, the court held that Truck was entitled to equitable subrogation, because the county had caused the underlying loss. "County's negligent referral of a high-risk patient to Santa Marta resulted in injury to the Panduros, precipitated the Panduros' lawsuit against County and Santa Marta, and made it necessary for Santa Marta to incur defense costs. Since Santa Marta was not at fault and County's misconduct was a substantial factor in causing Santa Marta to incur defense costs, we conclude that County is primarily liable and equitably should bear the entire obligation. We therefore conclude that Truck has established a right of subrogation against County subject to any applicable defenses that County may have." (*Truck, supra,* 95 Cal.App.4th at p. 27.)

As applied here, the first amended complaint alleges that Cleveland's negligence caused Frisby's lawsuit, and precipitated the lawsuit against Webcor and Cleveland, which made it necessary for Webcor to incur the costs of defense and settlement. Since it is not alleged that Interstate (or even

Webcor) was at fault, the allegations of the first amended complaint give rise to the inference that Cleveland should cover Webcor's defense and settlement costs.

There is, of course, a distinction between the circumstances of *Truck* and the facts of this case. *Truck* was decided after a trial had determined that the insured (Santa Marta) was not negligent and the proposed indemnitor (county) was negligent. By contrast, this case comes after a pair of good faith settlements in which the insured (Webcor) and the proposed indemnitor (Cleveland) each settled in purported relation to their respective degrees of liability. We must ask, therefore, whether the procedural posture of this case compels an analysis or result different from that in *Truck*. In particular, is it appropriate to consider the extent to which Cleveland *tortiously* caused the loss (which would ordinarily be the subject of a claim for equitable indemnity), in determining whether Cleveland may be held liable for the loss under a subrogated claim for *contractual* indemnity, where the parties have already indicated by good faith settlements their proportionate culpability for the underlying injuries to Frisby?

First, it must be emphasized—contrary to Cleveland's protestations—that Interstate's allegations of Cleveland's negligence are not being used to assert an equitable indemnity claim. The only consideration of the extent to which Cleveland caused the underlying loss (i.e., its alleged negligence in causing Frisby's injuries) is to determine whether the equities tip in Interstate's favor, so that Interstate may pursue in subrogation a contractual indemnity claim. In other words, Interstate's indemnity claim is based solely on Cleveland's contractual obligations (the indemnity provision), Cleveland's breach of contract (not providing or paying for a defense or the settlement of Webcor's liability in *Frisby*), and the resulting contractual damages (the costs of defending against and settling Frisby's claims against Webcor).[5]

Second, we see no reason that Cleveland's alleged negligence in causing the loss should be ignored in determining the respective equities of the parties, simply because Interstate is seeking to subrogate to a contractual indemnity claim rather than an equitable indemnity claim. The court in *Truck* considered the county's negligence in permitting the insurer to pursue the county on a contractual indemnification claim. Consideration of Cleveland's alleged causation of the underlying loss is entirely consistent with the fundamental proposition set forth in every relevant case the parties have cited: the party more responsible for the loss, or in a better position to avoid it, should bear the loss.

---

[5] Nor are the allegations of Cleveland's negligence being used to ascertain the extent of Cleveland's duty of contractual indemnity, which must be determined from the contract rather than in reliance on the doctrine of equitable indemnity. (*Rossmoor, supra*, 13 Cal.3d at p. 628.)

Third, we recognize that the good faith settlement order in the underlying case determined that the amount Cleveland paid to Frisby to settle the case was sufficiently proportionate to Cleveland's *tort* liability to Frisby. Notwithstanding its good faith settlement, however, Cleveland should have appreciated the risk that this litigation would ensue, because a good faith settlement order does not bar contractual indemnity claims.[6]

In the final analysis, consistent with authorities such as *Patent Scaffolding*, *Pylon*, and *Truck*, Interstate's allegations that Cleveland caused the injuries giving rise to the loss supports the inference that Interstate's equitable position is superior to Cleveland's.

### b. *The nature and context of the parties' promises to indemnify*

Aside from Cleveland's alleged cause of the underlying loss, another factor in the comparison of Interstate's and Cleveland's equities relates to the nature and context of their respective agreements to indemnify Webcor. While Cleveland agreed to indemnify Webcor in the subcontractor agreement pertaining to the project from which the underlying injury arose, Interstate was a third party insurer uninvolved in the project.

In *Fireman's Fund Ins. Co. v. Wilshire Film Ventures, Inc.* (1997) 52 Cal.App.4th 553 [60 Cal.Rptr.2d 591] (*Wilshire*), Wilshire Film Ventures, Inc. (Wilshire), leased camera equipment from Leonetti Company (Leonetti), under an agreement requiring Wilshire to return the equipment by a certain date or pay its value. (*Id.* at p. 555 & fn. 1.) Through no fault of Wilshire, burglars broke into a van and stole the equipment while it was on lease to Wilshire. Wilshire refused to pay Leonetti for the equipment. Leonetti submitted a claim to its own insurer (Fireman's Fund), which paid the claim and filed a subrogation action against Wilshire for breach of its contractual obligations. A jury found for Fireman's Fund. (*Ibid.*)

On appeal, Wilshire cited *Patent Scaffolding* and argued that subrogation was inappropriate because Wilshire had not caused the burglary. (*Wilshire, supra,* 52 Cal.App.4th at p. 556.) The Court of Appeal asserted: "Wilshire

---

[6] Cleveland asserts that the good faith settlement cuts off Cleveland's tort liability and precludes a finding that Cleveland was primarily responsible for Frisby's injuries or that Delta or Webcor was not primarily responsible for them. It cites to an order in *Frisby* simply providing that Webcor's and Cleveland's good faith settlement motions, being unopposed, were granted. Neither the order nor allegations in *Frisby* that Webcor contributed to the injuries demonstrate dispositively that Webcor was the primary cause of harm. On this record, Cleveland's conclusory assertion, unsupported by relevant legal authorities or record citations, does not establish that the good faith settlements preclude Interstate's cause of action as a matter of law.

misses the point." (*Ibid.*) Independent of who caused the burglary, the insurer could pursue its claim against Wilshire.

The court first distinguished *Patent Scaffolding*, because both parties in that case (the insurer and Simpson) had agreed to indemnify the *same* loss, since both agreed to obtain insurance to cover potential fire damage; but Fireman's Fund and Wilshire had *not* agreed to indemnify the same loss, since Fireman's Fund agreed to provide insurance while Wilshire agreed to pay for the equipment if it did not return it. (*Wilshire, supra,* 52 Cal.App.4th at p. 557.)[7]

The court then compared Fireman's Fund's insurance obligation with Wilshire's contractual obligation, and concluded that Wilshire's obligation to pay for the equipment if it was not returned made it primarily liable for the loss, even though it had not caused the loss. (*Wilshire, supra,* 52 Cal.App.4th at p. 558.) The court concluded: "It follows that, on our facts, Fireman's Fund's position is superior to Wilshire's position. Wilshire was obligated to return the equipment or pay for it, not merely to provide insurance coverage. Wilshire did neither, and is therefore in breach of its contractual obligation. Fireman's Fund, on the other hand, fully performed its contractual obligation by paying its insured the benefits due under its contract. As between these parties, therefore, the equities are with Fireman's Fund and it is entitled to recover from Wilshire. [Citations.]" (*Id.* at pp. 558–559.)[8]

---

[7] The court in *Wilshire* also explained a shortcoming in the *Patent Scaffolding* reasoning: "The problem with *Patent Scaffolding*'s 'causal connection' approach is that it appears to preclude recovery in any case in which the defendant's negligence is not the cause of the insured's loss, a result inconsistent with the rule articulated in *Patent Scaffolding* itself and the cases on which it relies. As noted at the outset, the first element of a subrogation claim is satisfied if the insurer proves that the insured suffered a loss for which the defendant is liable *either* (a) because the defendant is a wrongdoer whose act or omission caused the loss *or* (b) because the defendant is legally responsible to the insured for the loss caused by the wrongdoer." (*Wilshire, supra,* 52 Cal.App.4th at p. 557.)

We find the reasoning of *Patent Scaffolding* puzzling on another ground. The court defended its ruling because "[t]he contest is not between two insurance companies, each of which has received premiums for bearing the loss which ultimately occurred, but between insurers and a general contractor [Simpson] who received no independent consideration for the assumption of the risk." (*Patent Scaffolding, supra,* 256 Cal.App.2d at p. 516.) This distinction suggests that the equitable positions of the insurers and Simpson were not equal, but favored Simpson. On the same page of its opinion, however, the court indicated a contrary view, declaring that "had Simpson first paid, it *likewise* would be denied equitable subrogation against the insurers." (*Ibid.,* italics added.)

[8] Cleveland argues that *Wilshire* is inapposite because it did not involve a good faith settlement. *Patent Scaffolding* and other cases on which Cleveland relies did not involve a good faith settlement either. In any event, Cleveland has not shown the distinction to be material, because a good faith settlement does not preclude the express contractual indemnity claim Interstate alleged.

Applying *Wilshire* to the matter at hand, Cleveland and Interstate did not agree to indemnify the same loss. Cleveland agreed to indemnify and hold harmless Webcor from all claims "arising out of or in connection with [Cleveland's] operations to be performed under this Agreement," for, but not limited to, personal injury (including bodily injury) to an employee of another subcontractor, "caused or alleged to be caused in whole or in part by any negligent act or omission of Subcontractor." (Agreement, § 15.1.1.) It also agreed to indemnify Webcor for losses or liability Webcor incurred for Cleveland's failure to procure liability insurance with Webcor as an additional insured and other breaches of Cleveland's obligations. (Agreement, §§ 15.1.1(f), 16.) By contrast, the Interstate insurance policy provided coverage to Webcor for amounts Webcor became legally obligated to pay as damages because of bodily injury to which the insurance applied, without limiting it to liability arising out of or in connection with Cleveland's operations to be performed under the Webcor-Cleveland subcontract. (See *Pylon, supra,* 271 Cal.App.2d at p. 648 [insurer and indemnitor under contract provision did not indemnify the same risk].)

Furthermore, comparing Interstate's undertaking with Cleveland's undertaking tips the scale of equities in Interstate's favor. An entity which, like Cleveland, agrees to indemnify *the other party to the underlying transaction* has a liability of greater primacy than an independent insurer that insures against loss. (See *Wilshire, supra,* 52 Cal.App.4th at pp. 558–559; *Meyer Koulish Co. v. Cannon* (1963) 213 Cal.App.2d 419, 423, 429 [28 Cal.Rptr. 757] (*Meyer Koulish*) [insurer was entitled to equitable subrogation against the party who had agreed to accept the risk of loss for consigned jewelry until its return to the insured].) The parties directly involved in the transaction are better able to evaluate and control the risk. Therefore, for purposes of weighing the equities in an equitable subrogation case, and absent language in the insurance policy or indemnification agreement leading to a contrary conclusion (which the parties here do not contend exists), the Agreement between the parties who were connected to the incident giving rise to the loss (Webcor and Cleveland as workers at Frisby's job site) creates the greater equitable responsibility for indemnification, as compared to that of the general liability insurer (Interstate).[9]

---

[9] Our conclusion is also consistent with numerous cases holding that the insurer of a party who contractually agreed to indemnify another party can be held entirely liable for the loss, notwithstanding the provisions of the competing insurance agreements, in order to give effect to the contractual indemnification provision. (See, e.g., *Hartford Casualty Ins. Co. v. Mt. Hawley Ins. Co.* (2004) 123 Cal.App.4th 278, 289–298 [20 Cal.Rptr.3d 128], and cases cited therein.)

### c. *Interstate's receipt of premiums is not dispositive*

Cleveland insists, based on language found in *Patent Scaffolding*, that Interstate should not be able to obtain indemnification from Cleveland because it accepted premiums to insure the risk of loss. Cleveland is incorrect.

In our view, the fact that Interstate accepted premiums is not particularly significant, since every insurer that pays a loss on behalf of its insured will have accepted premiums for the risk. Furthermore, while Interstate was compensated for undertaking the risk of loss, so was *Cleveland,* which accepted consideration for the performance of its obligations under the Webcor-Cleveland subcontract. (See *California Food Service Corp. v. Great American Ins. Co.* (1982) 130 Cal.App.3d 892, 900, fn. 2 [182 Cal.Rptr. 67].) Finally, while it may be that Interstate merely did what it was obligated to do under the insurance policy, that does not change the fact that Cleveland did *not* do what it was allegedly obligated to do under the indemnification provision, after it allegedly caused the loss.

The extent to which an insurer's receipt of premiums relates to the equities of subrogation was clarified by this appellate district in *State Farm General Ins. Co. v. Wells Fargo Bank, N.A.* (2006) 143 Cal.App.4th 1098 [49 Cal.Rptr.3d 785] (*State Farm*). There, the premises of State Farm's insureds sustained damage from a fire that had started in an adjacent apartment building. State Farm paid its insureds' claim for the fire loss, and then sued in subrogation the other apartment building's owner and others (respondents). Although the respondents had not actually ignited the fire, State Farm contended the fire was caused by the respondents' negligent failure to provide for the safe disposal of fireplace ashes. The trial court granted summary judgment in favor of the respondents, on the ground that State Farm's claims were barred by the doctrine of superior equities. (*Id.* at p. 1103.)

The appellate court reversed. The court rejected the respondents' contention that the insurer was not entitled to subrogation due to its receipt of premiums. "[T]he fact that an insurer has been compensated for its risk *does not,* in and of itself, swing the balance in favor of a third party. [Citation.] Rather, compensation is a 'fact to be considered, it is no more than that . . . .' [Citations.]" (*State Farm, supra,* 143 Cal.App.4th at pp. 1110–1111, italics added.)

The *State Farm* court then noted that "a significant factor in weighing the equities is whether a defendant's negligent acts were *related* to or contributed to the primary cause of loss," and the issue was "whether respondents were in a better position to avoid the loss than State Farm or its insureds." (*State*

*Farm, supra*, 143 Cal.App.4th at p. 1118.) "While arguably an insurer should in fairness bear the loss where the third party's liability is *solely* contractual [citing *Morse, Meyers*, and *Patent Scaffolding* but noting the split of authority in *Wilshire* and *Meyer Koulish*], such a result seems unfair when the loss has been caused by the third party's tortious conduct." (*State Farm*, at p. 1118 & fn. 12, italics added, fn. & citations omitted.) Because State Farm alleged that the respondents negligently permitted a fire to occur and to spread to its insureds' property, it could proceed in subrogation against the respondents, even though the respondents had not actually started the fire. (*Id.* at p. 1119.)

The court in *State Farm* ruled: "In the case at bench, the contest is between an innocent insurance company (which admittedly received premiums for the very loss that occurred) and alleged tortfeasors (who did not physically start the fire, but whose negligence allegedly permitted the fire to be started and to spread by failing to provide for the safe disposal of fireplace ashes). On this record, we cannot say that respondents are entitled to judgment as a matter of law, based on the doctrine of superior equities. We reverse the trial court's order granting summary judgment on that basis." (*State Farm, supra*, 143 Cal.App.4th at p. 1119.)

As applied in the matter before us, Interstate's acceptance of premiums does not itself preclude subrogation as a matter of law, particularly since the risk it insured was distinct from the risk Cleveland agreed to indemnify, and Cleveland's alleged negligence contributed to the loss. Based on the allegations of the first amended complaint, *State Farm* indicates that Cleveland's demurrer should have been overruled.

### d. *Public policy favors equitable subrogation under the facts alleged*

*Patent Scaffolding* recognized the unfairness of precluding an insurer from subrogating to a claim against a party who had refused to live up to its promise of contractual indemnification. The court acknowledged that its rule led to a result that "appears to reward delay in the payment of just claims because had Simpson first paid, it likewise would be denied equitable subrogation against the insurers," but chalked it up to the fact that justice is not always perfect and the insurer could have sought equitable contribution (to share the loss) rather than the all-or-nothing equitable subrogation. (*Patent Scaffolding, supra*, 256 Cal.App.2d at p. 516.) Here, of course, equitable contribution is no longer available to Interstate because of the determination that Cleveland's settlement was a good faith settlement. Although one could fault Interstate for not tying up that loose end in the *Frisby* litigation, the fault (if any) could also be laid at Cleveland's feet for the same reason. It may also be that the parties found it more prudent to resolve the underlying

*Frisby* litigation promptly, without the delay that would be entailed in litigating this indemnification dispute.

In any event, the result we reach in this case avoids the injustice of *Patent Scaffolding*. In our view, it is not a good idea to reward parties who refuse to fulfill their alleged indemnification obligations, particularly under the rubric that they are in as good or better an *equitable* position as the insurer that did fulfill its alleged indemnification obligation. We believe it is more prudent to permit subrogation, so that a party with an alleged contractual indemnification obligation will be encouraged to step up in the underlying case and either fulfill the obligation (and implicitly help settle the case) or resolve any dispute over the application of the indemnification obligation. If permitting subrogation to the insurer in any way results in a windfall (because the insurer that accepted premiums to insure against the loss may now shift the loss to the other indemnitor), it would be better for the windfall to go to the one that undisputedly fulfilled its contractual obligations, rather than to the one that allegedly breached them.

In the matter before us, Interstate issued insurance, accepted Webcor's defense, and made the payment to resolve the claims against Webcor. According to the allegations of the first amended complaint, Interstate did everything it was supposed to do to fulfill its contractual obligations to Webcor. Cleveland, on the other hand, allegedly did not. Although contractually obligated to obtain insurance covering Webcor, it failed to do so. Notwithstanding its alleged contractual obligation to defend and indemnify Webcor, it refused to defend or indemnify. While Interstate had nothing to do with the incident underlying the *Frisby* litigation, Cleveland was allegedly a contributory cause to Frisby's injuries. The comparison, therefore, is between one party who had nothing to do with causing the loss but abided by its contractual obligation to pay for it, and another party who caused the loss and then shunned its contractual obligation to pay it. Based on the allegations of the first amended complaint, Interstate is in a superior equitable position to Cleveland.

e. *Cleveland's cases are inapposite*

The remaining cases on which Cleveland relies are distinguishable from this case. In *California Food Service Corp. v. Great American Ins. Co., supra*, 130 Cal.App.3d 892, a corporation (Sandy's) operated a restaurant under a lease requiring it to obtain fire insurance on the building. Sandy's insured the building through its insurer (Highlands). Sandy's later agreed to sell the restaurant to CFS, which also obtained fire insurance on the building for the benefit of the building's owners, through Great American. (*Id.* at pp. 895–896.) Before the sale of the restaurant consummated, there was a fire. The owner of

the building looked to Sandy's, whose insurer, Highlands, paid the claim. (*Id.* at p. 896.) Highlands sought recovery in subrogation from CFS's insurer, Great American. (*Ibid.*) Viewing the Highlands contract and the CFS contract on equal footing, the court held that Highlands could not obtain equitable subrogation from CFS's insurer, Great American. (*Id.* at pp. 895, 901.) The court nonetheless found that the insurers should split the loss under the doctrine of equitable contribution. (*Id.* at p. 895.)

*California Food Service Corp. v. Great American Ins. Co.*, which followed *Patent Scaffolding*, is distinguishable from this case for the same reason we distinguished *Patent Scaffolding*: in those cases, the insurer did not allege a causal connection between the defendant and the loss; in this case, Interstate made this allegation.

In *Fireman's Fund Ins. Co. v. Morse Signal Devices* (1984) 151 Cal.App.3d 681 [198 Cal.Rptr. 756] (*Morse*), Fireman's Fund insured certain commercial establishments that had contracted with one of several alarm companies to maintain burglar or fire alarms on the premises. (*Id.* at p. 685.) In those contracts, the alarm companies expressly disclaimed that the alarm systems would prevent burglary or fire loss, and stated that the alarm companies were not insurers, the commercial establishments assumed all risk of loss, and the alarm companies' liability was limited to liquidated damages. (*Id.* at pp. 685–686.) Fires or burglaries occurred at each commercial establishment when the alarm systems failed to function properly. (*Id.* at p. 686.) Fireman's Fund paid its insureds' claims and then sued the alarm companies, alleging they failed to perform their contractual duties to the insureds, but not alleging that they created the fires or perpetrated the burglaries. (*Id.* at p. 687.) The alarm companies filed demurrers to Fireman's Fund's complaint, which were sustained without leave to amend. (*Id.* at p. 684.)

The Court of Appeal affirmed. Because the alarm companies had not caused the loss, the equities of Fireman's Fund were not superior to those of the alarm companies, and equitable subrogation was unavailable. (*Morse, supra*, 151 Cal.App.3d at pp. 687–688.) The court also observed that the reasonable expectations of the insureds (parties to the alarm service contracts) had not been frustrated because the alarm companies had not represented that their alarms made the insured premises absolutely secure, and that it was for this reason the insureds had procured insurance for the losses they suffered. (*Id.* at p. 688.)

*Morse* is distinguishable from the matter at hand, because the alarm companies from which subrogation was sought expressly disclaimed any obligation to indemnify Fireman's Fund's insureds, while Cleveland expressly undertook the obligation to indemnify Interstate's insured. Furthermore, while Fireman's Fund's insureds and the alarm companies did not reasonably expect

the alarm companies to cover the loss, Interstate's insured and Cleveland did reasonably expect Cleveland to cover the loss, based on the indemnification provision in the Agreement.

In *Bramalea, supra,* 119 Cal.App.4th 468, a real estate developer (Bramalea) was sued by homeowners for construction defects. Bramalea's insurer, Zurich, hired counsel to provide a defense and filed cross-complaints against subcontractors for both equitable indemnity and contractual indemnity, the latter of which was based on a provision in the subcontractor agreement requiring the subcontractors to indemnify Bramalea and hold it harmless from all damages including attorney fees arising from the subcontractors' act or omission. (*Id.* at pp. 470–471.) Eventually, Bramalea tendered its defense to the subcontractors' insurers; the insurers accepted the tender. (*Id.* at p. 471.) The litigation was settled except as to Bramalea's right to recover from the subcontractors attorney fees incurred before its tender of the defense to the subcontractors' insurers. (*Id.* at p. 470.) The trial court dismissed the cross-complaint on the ground that Bramalea had no standing to recover the attorney fees from the subcontractors because it had not paid the attorney fees. (*Ibid.*) In so ruling, the court concluded: " *'This is not an action by Zurich for subrogation.* It is an action [by Bramalea] for indemnity and breach of contract.' " (*Id.* at p. 471, italics added.) Bramalea appealed.

On appeal, the court affirmed, holding that Bramalea could not maintain a claim against the subcontractors for attorney fees because it had suffered no out-of-pocket loss. (*Bramalea, supra,* 119 Cal.App.4th at pp. 472–473.) The court then proceeded to discuss an issue neither before it on appeal nor ostensibly presented by the case, volunteering that it was "questionable whether Zurich *could* pursue equitable subrogation against the subcontractors." (*Id.* at p. 474.) Noting a conflict of authority, the *Bramalea* court observed that under *Patent Scaffolding,* Zurich would not be entitled to equitable subrogation because the "attorney fees were not caused by the subcontractors' breach of their obligation to indemnify Bramalea . . ." but by the homeowners' lawsuit for construction defects, "which was one of the risks Zurich accepted premiums to cover," and "[w]hether the subcontractors caused the construction defects was not resolved by this litigation." (*Id.* at p. 475 & fn. 4.) The court added that Zurich could presumably pursue an action against the subcontractors for equitable contribution. (*Id.* at p. 475, fn. 5.)

*Bramalea* is unhelpful to our analysis. First, the language on which Cleveland relies is pure dictum. Second, *Bramalea* is distinguishable from this matter for the same reasons we distinguished *Patent Scaffolding.*

In sum, the allegations of Interstate's amended complaint establish each of the elements for subrogation. The court erred in sustaining the demurrer.

## III. *DISPOSITION*

The judgment is vacated and the order sustaining the demurrer to appellant's first amended complaint is reversed. The trial court shall enter a new order overruling the demurrer. Respondent shall pay appellant for appellant's costs on appeal.

Simons, Acting P. J., and Bruiniers, J., concurred.