[No. C061494. Third Dist. Jan. 7, 2011.]

JAMES DOBBAS et al., Plaintiffs, v.
FRED VITAS et al., Defendants, Cross-complainants and Respondents;
CALFARM INSURANCE COMPANY, Cross-defendant and Respondent;
AMERICAN GUARANTEE AND LIABILITY INSURANCE COMPANY,
Movant and Appellant.

## COUNSEL

No appearance for Plaintiffs.

Kutak Rock, J. David Bournazian, Paul F. Donsbach, Robin Zukin, Patrick W. Kennison, Jr., and Julie Dean Larsen for Movant and Appellant.

Cresswell, Echeguren, Rodgers & Noble, Ronald D. Echeguren and Elsa S. Baldwin for Defendants, Cross-complainants and Respondents.

Foran, Glennon Palandech Ponzi & Rudloff, Rudloff, Wood & Barrows, G. Edward Rudloff, Jr., and Edward P. Murphy for Cross-defendant and Respondent.

## OPINION

**BLEASE, J.**—This case reviews the denial of American Guarantee and Liability Insurance Company's motion to intervene in an action between James Dobbas and Fred Vitas and Fred Vitas Insurance Agency. The action is based on Vitas's failure to obtain excess insurance to cover an injury for which Dobbas was liable and for which American Guarantee was obligated to pay as an excess insurer. American Guarantee's claimed interest in the action is as a subrogee to Dobbas for Vitas's liability for failing to provide insurance to cover the injury.

The issue arises in the following way.

James Dobbas (Dobbas), the owner of a bull that escaped its pasture and caused a fatal automobile accident, sued his insurance agent, Fred Vitas and Vitas Insurance Agency (Vitas), because the agent either failed to procure or cancelled excess liability insurance from CalFarm Insurance Company (CalFarm) to cover the owner's ranching operations.

The claims of the injured parties were eventually paid pursuant to an excess policy issued by American Guarantee and Liability Insurance Company (American Guarantee), which listed Dobbas as a named insured. Dobbas assigned his rights against Vitas to the accident victims, and the victims assigned their interests to American Guarantee. American Guarantee, as Dobbas's assignee, sought reimbursement of the amounts paid, not from the

party responsible for the automobile accident, but from the agent, Vitas, who failed to procure excess insurance to cover the accident. Thus, American Guarantee sought to recover its payment to the injured parties from the broker, Vitas, who failed to provide excess insurance for Dobbas.

An insurer's right to subrogation is delimited by the application of equitable principles and not by the law of assignments. "[O]ne who asserts a right of subrogation, whether by virtue of an assignment or otherwise, must first show a *right in equity* to be entitled to such subrogation, or substitution . . . ." (*Meyers v. Bank of America National Trust & Savings Association* (1938) 11 Cal.2d 92, 96 [77 P.2d 1084] (*Meyers*).) Equitable subrogation requires an insurer to establish that its equitable position is superior to the position of the party to be charged.

The trial court denied American Guarantee's request to intervene in the negligence and breach of contract action against Vitas on the ground that the insurer was not entitled to equitable subrogation because the agent had not caused the accident. We agree with the result for the following reasons.

Code of Civil Procedure section 387[1] allows a person to intervene in an action if that person "has an interest in the matter in litigation, or in the success of either of the parties . . . ." American Guarantee's claim of an interest is based on the erroneous assumption that it would have had no responsibility to pay the injured parties had Vitas fulfilled his obligation to procure excess insurance to cover the loss. In fact, American Guarantee would have been responsible for its share of the injury even if the policy promised by Vitas had been in place. That being the case, American Guarantee is not entitled to reimbursement.

For that reason we shall conclude that the trial court correctly concluded the insurer has no interest in the action against the insurance agent because the insurer cannot establish the elements of a claim for equitable subrogation.

## FACTUAL AND PROCEDURAL BACKGROUND

In May 2002, James Dobbas was a rancher living in Sierra County. Prior to that time, he contracted with Vitas to procure primary and umbrella, or excess, insurance on his property, including his property in Sierra County. Through Vitas, Dobbas obtained a CalFarm primary liability policy that provided $1 million coverage for Dobbas's livestock-husbandry activities.

---

[1] References to an undesignated section are to the Code of Civil Procedure.

Vitas also procured a CalFarm excess policy for Dobbas that provided $3 million per occurrence, but it was not in effect at the time of the accident.[2]

Dobbas was also a named insured under policies by the two other insurance companies issued to James Dobbas, Inc. (JDI), a railroad contractor with operations including railroad salvage and emergency response to train derailments. These policies included a primary coverage policy issued by Steadfast Insurance Company (Steadfast) in the amount of $1 million per occurrence, and an excess policy issued by American Guarantee in the amount of $7 million per occurrence. Both policies expressly provided that Dobbas as an individual was insured "only with respect to the conduct of a business of which [the individual] is a sole owner."

On May 27, 2002, an Angus bull belonging to Dobbas escaped from the pasture in which it had been confined. A vehicle (the Turner vehicle) collided with the bull and with another vehicle (the Mancini vehicle). Two fatalities resulted, and four other occupants were injured.

The victims filed suit against Dobbas in the United States District Court for the District of Nevada. It was discovered that Dobbas's insurance agent, Vitas, had either cancelled or failed to renew the CalFarm excess policy, so that at the time of the subject accident, the CalFarm excess policy was not in effect.

In settlement of the federal action, CalFarm agreed to pay the $1 million primary policy limit to the Mancinis and Turners. The parties agreed to binding arbitration to determine Dobbas's liability and to apportion the recovery between the Turner and Mancini plaintiffs. Dobbas assigned to the Mancinis and Turners his claims against Vitas for cancellation and nonrenewal of the CalFarm excess policy, and the Turners and Mancinis agreed never to execute on any judgment against Dobbas's personal assets. At the time of this settlement the parties were unaware of coverage from the policies issued by Steadfast and American Guarantee.

The binding arbitration resulted in a $5 million award against Dobbas, and the Nevada district court confirmed the award and entered judgment against Dobbas. Pursuant to the agreement of the parties, the judgment was not appealable.

---

[2] In 2001, CalFarm was purchased by Allied Insurance Company, which issued a renewal of the policy in its own name. We will refer to CalFarm as the insurer in an effort to simplify the facts.

Thereafter, the Turners and Mancinis were informed of the Steadfast and American Guarantee policies. Steadfast and American Guarantee filed an action in the United States District Court for the Eastern District of California seeking declaratory relief with respect to their rights and obligations under their policies. In that case, the court granted the summary judgment motion of Steadfast declaring the Steadfast policy did not provide coverage for the accident. However, the court denied the summary judgment motion of American Guarantee, finding Dobbas's ranching activities were covered by American Guarantee's excess liability policy.

American Guarantee then entered into a settlement with the Mancinis and Turners for $2.8 million, and as part of the settlement the Mancinis and Turners assigned their claims (previously assigned to them by Dobbas) against Vitas to American Guarantee. The settlement occurred in April 2008.

Within one year of the accident, in May 2003, Dobbas filed this insurance broker malpractice action against Vitas, alleging professional negligence, breach of contract, and declaratory relief.[3] Vitas cross-complained against CalFarm for indemnity, apportionment of fault and implied contractual indemnity. The Mancinis and Turners brought motions to intervene in the action based upon the assignment to them of Dobbas's claims against Vitas. The trial court granted the Turners' motion to intervene, but denied the motion of the Mancinis without prejudice because their attorney had not been granted permission to appear *pro hac vice*. The trial court also stayed the action pending the determination of coverage under the Steadfast and American Guarantee policies.

Subsequent to the settlement between American Guarantee and the Mancinis and Turners, American Guarantee, now the owner of Dobbas's claims against Vitas, filed a motion to intervene in this action, originally filed by Dobbas. The trial court denied the motion to intervene, stating merely that American Guarantee was not entitled to equitable subrogation against Vitas because its loss was not caused by Vitas's failure to maintain the CalFarm policy, but by the accident, the accident being the very risk American Guarantee assumed.

## DISCUSSION

█ The trial court's order denying leave to intervene is directly appealable because it finally and adversely determines the moving party's right to proceed in the action. (*Hodge v. Kirkpatrick Development, Inc.* (2005) 130 Cal.App.4th 540, 547 [30 Cal.Rptr.3d 303] (*Hodge*).)

---

[3] Dobbas's wife, Pamela, was also a plaintiff in the action. We refer to them collectively as Dobbas.

As noted section 387 allows a person to intervene in an action if that person "has an interest in the matter in litigation, or in the success of either of the parties . . . ." The parties agree that the standard of review for denying permissive intervention under section 387, subdivision (a) is abuse of discretion. However, the parties disagree whether the proper standard of review for denying mandatory intervention is de novo, or abuse of discretion.

We shall conclude that the denial of mandatory intervention was proper under either standard, and denial of permissive intervention was not an abuse of discretion. We agree with the trial court that any right American Guarantee may have to intervene in the insurance broker malpractice action is conditioned upon its rights as a subrogee or assignee of Dobbas's claims against Vitas. We must therefore decide the substantive merits of American Guarantee's subrogation rights in order to resolve whether it should have been allowed to intervene in the action.

American Guarantee argues it was not required to prove whether Vitas would ultimately be liable, but only to show it had an interest in the matter in litigation. However, the trial court did not require that American Guarantee prove Vitas's negligence or breach of contract. Rather, it required American Guarantee to show that it was entitled to stand in Dobbas's shoes for the purpose of litigating the claims against Vitas.

American Guarantee claims a right to intervene in this action based upon two theories: (1) assignment of the claims against Vitas, and (2) equitable subrogation based upon its payment of money in satisfaction of claims against its insured, Dobbas. As we shall show, American Guarantee has not established its right to pursue the action under either theory.

I

Subrogation

Under the doctrine of equitable subrogation, an insurer that has paid its insured for a loss caused by a third party succeeds to the insured's rights against the third party in the amount paid to the insured. (*Hodge, supra,* 130 Cal.App.4th at p. 548.) Where the insured has initiated a lawsuit against a wrongdoer, the subrogated insurer is entitled to seek recovery of sums it paid by intervening in the insured's lawsuit. (*Id.* at p. 551.)

We look to the elements of equitable subrogation to determine whether American Guarantee has a claim that would entitle it to intervene in Dobbas's action. An insurer bringing an action based upon a claim of equitable subrogation must establish the following elements: "(1) The insured

has suffered a loss for which the party to be charged is liable, either because the latter is a wrongdoer whose act or omission caused the loss or because he is legally responsible to the insured for the loss caused by the wrongdoer; (2) the insurer, in whole or in part, has compensated the insured for the same loss for which the party to be charged is liable; (3) the insured has an existing, assignable cause of action against the party to be charged, which action the insured could have asserted for his own benefit had he not been compensated for his loss by the insurer; (4) the insurer has suffered damages caused by the act or omission upon which the liability of the party to be charged depends; (5) justice requires that the loss should be entirely shifted from the insurer to the party to be charged, whose equitable position is inferior to that of the insurer; and (6) the insurer's damages are in a stated sum, usually the amount it has paid to its insured, assuming the payment was not voluntary and was reasonable." (*Patent Scaffolding Co. v. William Simpson Constr. Co.* (1967) 256 Cal.App.2d 506, 509 [64 Cal.Rptr. 187] (*Patent Scaffolding*).)

The trial court apparently found American Guarantee's equitable subrogation claim deficient for failure to establish the first factor, stating: "American Guarantee's loss was not caused by Vitas' failure to maintain the CalFarm policy. Rather, American Guarantee's loss was caused by the vehicle versus livestock accident, which was the very risk that American Guarantee assumed."

*Hodge*, a case relied upon by American Guarantee, is a classic equitable subrogation case in which the insurer paid its insureds, who were homeowners, for damage caused by the negligent construction of their house. (*Hodge, supra*, 130 Cal.App.4th at p. 546.) The court held the insurer was equitably subrogated to the defendants and tortfeasors in the homeowners' construction defect lawsuit. (*Id.* at p. 550.) This case differs in that American Guarantee seeks reimbursement not from the party that caused the loss it covered, but from another party that is alleged to have been contractually bound to procure insurance for the loss.

The facts are not as straightforward as those in *Hodge* because the insurance company, American Guarantee, is not attempting to collect from the party responsible for the automobile accident, but from another party who agreed to procure insurance. *Patent Scaffolding* is closer to the facts of this case, and in fact the trial court's decision echoes the language of *Patent Scaffolding, supra*, 256 Cal.App.2d at page 512. In that case the insurers of a subcontractor (Patent) sued the general contractor (Simpson) when a fire destroyed the subcontractor's equipment at the jobsite. (*Id.* at p. 508.) Patent and Simpson had agreed that Simpson would procure fire insurance for Patent's protection, but no such insurance was ever obtained. (*Ibid.*) Patent collected from its own insurers, and they in turn claimed they were equitably subrogated to Patent's claim upon its contract with Simpson. (*Ibid.*)

The court denied the insurers' equitable subrogation claim. After setting forth the elements of equitable subrogation, the *Patent Scaffolding* court explained the reason for its denial, stating: "The insurers' loss was not caused by Simpson's failure to get insurance or to indemnify Patent. The insurers' loss was caused by the fire, the very risk which each assumed, and Simpson's failure to perform its contractual duty had nothing to do with the fire." (*Patent Scaffolding, supra*, 256 Cal.App.2d at p. 512.) *Mid-Century Ins. Co. v. Hutsel* (1970) 10 Cal.App.3d 1065, 1070 [89 Cal.Rptr. 421], followed the causal reasoning of *Patent Scaffolding*.

█   Although *Patent Scaffolding* emphasized the causal connection element of equitable subrogation, it recognized that prior cases had expressed the rule in terms of superior equities: "Where two parties are contractually bound by independent contracts to indemnify the same person for the same loss, the payment by one of them to his indemnitee does not create in him equities superior to the nonpaying indemnitor, justifying subrogation, if the latter did not cause or participate in causing the loss." (*Patent Scaffolding, supra*, 256 Cal.App.2d at p. 514.)

*Fireman's Fund Ins. Co. v. Wilshire Film Ventures, Inc.* (1997) 52 Cal.App.4th 553 [60 Cal.Rptr.2d 591] (*Fireman's*), concluded that *Patent Scaffolding* was correctly decided, not because there was no causal connection between the failure to get insurance and the fire, but because the insurers' equitable position was not superior to Wilshire Film Ventures's (Wilshire).

In *Fireman's*, the defendant (Wilshire) leased camera equipment from Leonetti under a lease agreement that obligated Wilshire to return the equipment by a certain date or pay its full value. (*Fireman's, supra*, 52 Cal.App.4th at p. 555.) The equipment was stolen, and Wilshire refused to pay for the equipment. Leonetti submitted a claim to its insurer, Fireman's. After paying the claim, Fireman's sued Wilshire for equitable subrogation. The trial court found Leonetti could recover from Wilshire, and the Court of Appeal affirmed. (*Ibid.*)

The court noted that *Patent Scaffolding*'s focus on a causal connection was inconsistent with the rule it articulated. (*Fireman's, supra*, 52 Cal.App.4th at p. 557.) The first element in an equitable subrogation claim is that the insured suffered a loss for which a third party is liable *either* because the third party is a wrongdoer whose act or omission caused the loss, *or* because the third party is legally responsible to the insured for the loss caused by the wrongdoer. (*Ibid.*)

*Fireman's* recognized that "[t]he problem with *Patent Scaffolding*'s 'causal connection' approach is that it appears to preclude recovery in any case in

which the defendant's negligence is not the cause of the insured's loss, a result inconsistent with the rule articulated in *Patent Scaffolding* itself and the cases on which it relies. . . . *Patent Scaffolding* does not explain how it is that a defendant who is not the wrongdoer can (other than by a breach of contract) nevertheless be the 'cause' of the insured's loss, and we confess that we are unable to imagine a scenario that would meet [*Patent Scaffolding*'s] test. Conversely, there is ample authority and logic for [*Patent Scaffolding*'s] conclusion that, so long as the defendant was legally responsible to the insured for the loss caused by the wrongdoer (as was Wilshire in our case), the first element is satisfied (*Meyers* v. *Bank of America etc. Assn., supra*, 11 Cal.2d at p. 102) and the question then to be answered is whether, absent any wrongdoing, the equities favor the insurer or the defendant." (*Fireman's, supra*, 52 Cal.App.4th at p. 557.)

In *Fireman's*, the court held that the equities favored the insurer because Wilshire, the lessee of the camera equipment, was obligated to return the equipment or pay for it, and not merely to provide insurance coverage. (*Fireman's, supra*, 52 Cal.App.4th at pp. 558–559.) For this reason the equities were with the insurer. (*Id.* at p. 559.) This case differs in that both Vitas and American Guarantee agreed to provide insurance to Dobbas. Vitas agreed to procure an excess policy, and American Guarantee agreed to insure Dobbas through its excess insurance policy. There are no superior equities here.

■ Here, as in *Patent Scaffolding*, the party against whom the insurer seeks subrogation was not the wrongdoer whose act caused the loss, but another party responsible to the insured for obtaining insurance for the loss. In *Patent Scaffolding*, Simpson was contractually obligated to Patent Scaffolding to procure fire insurance. Here, Vitas is alleged to have been contractually obligated to Dobbas to procure excess liability insurance coverage for the accident that occurred. Where the insurer and another party both have independent contract obligations to the insured, the insurance company's satisfaction of its primary liability does not entitle it to recover against the other party on that party's independent obligation. (*Meyers, supra*, 11 Cal.2d at p. 102.)

"In subrogation litigation in California, the doctrine of superior equities is critical in determining whether a right of subrogation exists." (*State Farm General Ins. Co. v. Wells Fargo Bank, N.A.* (2006) 143 Cal.App.4th 1098, 1108 [49 Cal.Rptr.3d 785].) The issue is addressed by the fifth element of equitable subrogation, i.e., whether justice requires that the loss be entirely shifted from the insurer to the third party. The equities do not permit recovery where the insurer and the third party promised the same thing, to provide insurance. (*Fireman's, supra*, 52 Cal.App.4th at p. 558.)

By contrast, in *Meyer Koulish v. Cannon* (1963) 213 Cal.App.2d 419 [28 Cal.Rptr. 757], the equities permitted recovery. There, the manufacturer of jewelry consigned the jewelry to the defendant pursuant to an agreement that imposed the risk of loss on the defendant. When the jewelry was stolen through no fault of the defendant, the defendant refused to pay. The manufacturer's insurer paid for the jewelry, and sued the defendant for subrogation. The court held that the defendant accepted primary liability for the jewelry when it agreed to the consignment contract, such that it was not on an equal footing with the insurance company, in whose favor the equities preponderated. (*Id.* at p. 429.)

*Fireman's* analyzed the facts in *Meyer Koulish* and *Patent Scaffolding*, and concluded that its facts, like those in *Meyer Koulish*, permitted recovery under equitable subrogation. The court stated that the equities permitted recovery in *Meyer Koulish* because the consignee's contractual responsibility was primary, the consignee having promised to return or pay for the jewelry. (*Fireman's, supra*, 52 Cal.App.4th at p. 558.) In *Patent Scaffolding*, however, the general contractor had merely promised to provide insurance, which was the same obligation undertaken by the subcontractor. *Fireman's* concluded that in its case the insurer's position was superior to the lessee's because the lessee had obligated itself to return the equipment or pay for it, not merely to provide insurance coverage. (*Id.* at pp. 558–559.)

Here, as in *Patent Scaffolding*, justice does not require that the loss be shifted entirely from the insurer because Vitas was merely obligated to obtain insurance for the loss. A federal court determined that the American Guarantee excess policy covered the accident in question. Had Vitas not cancelled or failed to renew the excess policy with CalFarm, both policies would have been available to satisfy a judgment against Dobbas.

American Guarantee insists that it would not have been required to pay anything to the injured parties had Vitas not cancelled the CalFarm policy. For this reason, it claims superior equities, arguing that it was forced to make payment because of Vitas's negligence. This erroneous argument is based upon the apparent assumption that no one would have discovered the American Guarantee policy if the CalFarm excess policy had been in place. This factual possibility does not change American Guarantee's legal position. A federal court has decided that the American Guarantee policy provided coverage for the accident in question. Had the CalFarm excess policy been in place, American Guarantee still would have been legally responsible for its pro rata share of damages.

American Guarantee relies in part on *Troost v. Estate of DeBoer* (1984) 155 Cal.App.3d 289 [202 Cal.Rptr. 47] (*Troost*). In that case Troost, who was the

insured, contracted with his insurance agent, DeBoer, for $1 million of liability coverage. (*Id.* at p. 292.) DeBoer obtained a primary policy that had a $100,000 limit, and an excess policy, issued by Aetna, that effectively had a $250,000 deductible, leaving a $150,000 gap in insurance coverage. (*Id.* at p. 293.) As the result of an automobile accident, Troost was sued. (*Ibid.*) A settlement ensued in the amount of $300,000, pursuant to which the primary insurer paid the $100,000 limit of its policy, and Aetna agreed to pay $200,000, covering the $150,000 gap in coverage. (*Ibid.*)

The court held that Aetna was entitled to equitable subrogation against DeBoer, in part because Aetna established the superior equity of its claim. Aetna was not contractually bound to indemnify Troost for the amount between $100,000 and $250,000, and even though DeBoer was likewise not contractually bound to do so, it was his wrong which created the potential liability. (*Troost, supra,* 155 Cal.App.3d at p. 297.) " 'The rule in equitable phraseology is this: Where two parties are contractually bound by independent contracts to indemnify the same person for the same loss, the payment by one of them to his indemnitee does not create in him equities superior to the nonpaying indemnitor, justifying subrogation, if the latter did not cause or participate in causing the loss.' " (*Ibid.,* quoting *Patent Scaffolding, supra,* 256 Cal.App.2d at p. 514.)

■ The critical difference between this case and *Troost,* was that in *Troost,* Aetna had not assumed liability for the amount paid to the injured party. As between Aetna and the insurance agent, who had contracted to obtain insurance, the equities clearly weighed in favor of Aetna. Here, American Guarantee contracted to provide insurance to Dobbas that covered the accident in question. The fact that Vitas failed to obtain insurance that also would have covered the accident, does not create in American Guarantee an equity superior to Vitas.

The First Appellate District recently decided *Interstate Fire & Casualty Ins. Co. v. Cleveland Wrecking Co.* (2010) 182 Cal.App.4th 23 [105 Cal.Rptr.3d 606]. That case supports our resolution even though the court held the plaintiff was entitled to equitable subrogation. It distinguished *Patent Scaffolding* from the case before it because (1) the defendant was alleged to have caused the loss; (2) the defendant "expressly promised to indemnify (not just to obtain insurance) in a contract related to the project from which the underlying loss occurred"; and (3) the insurer's receipt of premiums did not preclude it from being equitably superior to a party that contractually agreed to indemnify. (*Id.* at p. 39.) Here, Vitas did not cause the loss and did not contractually agree to indemnify, but only to obtain insurance. Therefore, American Guarantee is not in a superior equitable position to Vitas.

## II

## Assignment

Through assignment, American Guarantee owned Dobbas's claims against Vitas for failure to secure excess insurance for Dobbas's ranching operations. However, the express assignment added nothing to American Guarantee's right to recover from Vitas.

An insurer's right of subrogation is delimited by the application of equitable principles. Accordingly, the Supreme Court has determined that "one who asserts a right of subrogation, whether by virtue of an assignment or otherwise, must first show a *right in equity* to be entitled to such subrogation, or substitution . . . ." (*Meyers, supra*, 11 Cal.2d at p. 96.) In other words: "where by the application of equitable principles, a surety has been found not to be entitled to subrogation, an assignment will not confer upon him the right to be so substituted in an action at law upon the assignment. His rights must be measured by the application of equitable principles in the first instance, his recovery being dependable upon a right in equity, and not by virtue of an asserted legal right under an assignment." (*Id.* at p. 97.)

*Meyers* involved a surety on a fidelity bond. Fidelity bonds are generally recognized as resembling traditional insurance contracts rather than surety bonds because they are considered contracts of insurance between an insurer and an employer. (*State Farm General Ins. Co. v. Wells Fargo Bank, N.A., supra*, 143 Cal.App.4th at p. 1107, fn. 6.) The superior equities rule set forth in *Meyers* is regularly applied in California in the context of insurance, such that an insurer cannot enforce its subrogation rights in the claim its insured has against the party that caused the loss, unless the insurer's equities are superior to those of the wrongdoer. (*Id.* at p. 1108.)

Thus, although American Guarantee held an express assignment of Dobbas's cause of action against Vitas, American Guarantee's right to recover against Vitas is limited by the principles of equitable subrogation. As we have determined American Guarantee's equitable subrogation claim is defeated by the fact that its equitable position is not superior to Vitas's, American Guarantee has no basis upon which to intervene as of right in the action. Additionally, since American Guarantee cannot recover on the basis of equitable subrogation or assignment, it cannot establish a "direct and immediate interest" in the broker malpractice litigation or in the success of either of the parties. (*Hinton v. Beck* (2009) 176 Cal.App.4th 1378, 1383 [98 Cal.Rptr.3d 612].) Therefore, the trial court did not abuse its discretion in denying permissive intervention.

## DISPOSITION

The judgment (order) is affirmed. Costs are awarded to respondent CalFarm. (Cal. Rules of Court, rule 8.278 (a)(1), (2).)

Raye, P. J., and Nicholson, J., concurred.

A petition for a rehearing was denied February 1, 2011, and the opinion was modified to read as printed above.