Filed 2/8/16

<u>**CERTIFIED FOR PARTIAL PUBLICATION**</u>[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| AMCO INSURANCE COMPANY et al., <br><br> Plaintiffs and Appellants, <br><br> v. <br><br> ALL SOLUTIONS INSURANCE AGENCY, LLC, <br><br> Defendant and Respondent. | F070038 <br><br> (Super. Ct. Nos. CV57127, CV57121) <br><br><br> **OPINION** |

APPEAL from a judgment of the Superior Court of Tuolumne County. Kate Powell Segerstrom, Judge.

Alan Charles Dell'Ario; The Cole Law Firm and Stephen A. Cole, for Plaintiffs and Appellants.

Shewry & Saldaña and Steven M. Shewry for Defendant and Respondent.

-ooOoo-

---

[*]    Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of part III of the Discussion.

This appeal involves an insurance broker that allegedly failed to obtain insurance requested by its client, who subsequently sustained uninsured liability when he negligently caused a fire that spread to neighboring buildings. The client settled that uninsured liability by assigning to plaintiffs his causes of action against the insurance broker. The plaintiffs—neighboring business owners and an insurance company that paid for damages to a neighboring building—pursued the assigned causes of action by filing a lawsuit against the insurance broker. The insurance broker moved for summary judgment, which the trial court granted. The plaintiffs' appeal of the summary judgment presents three legal issues.

First, are a client's causes of action against an insurance broker or agent assignable? We conclude that California, like the majority of jurisdictions in the United States, recognizes the assignability of a client's causes of action against an insurance broker or agent for failing to obtain insurance.

Second, does the rule of superior equities from California's equitable subrogation doctrine apply to the contractual assignments in this case? We conclude that, in the insurance context, the rule from California's equitable subrogation doctrine applies to a contractual assignment only if the assignee is an insurance company and the assignor was that insurance company's policyholder. This relationship can give rise to an equitable subrogation when the insurance company (i.e., the subrogee) has paid a claim to or on behalf of the policyholder (i.e., subrogor).

In contrast, when the parties to an assignment do not have a relationship that might give rise to a transfer of rights by equitable subrogation, there is no reason why their assignment should be subject to the rules governing equitable subrogation. Consequently, the limitations contained in the doctrine of equitable subrogation only apply to assignments that attempt to replicate or bolster a transfer that might have occurred by operation of law under California's equitable subrogation doctrine. In this

2.

case, the assignees (an insurance company and neighboring business owners) did not issue an insurance policy to the assignor (i.e., the insurance broker's client) and therefore were never potential equitable subrogees of the assignor. Thus, we conclude their contractual assignments are not subject to the rule of superior equities.[1]

Third, did the insurance broker establish that there is no triable issue of material fact regarding its alleged negligent failure to obtain insurance? Our review of the record shows that the client and the employees of the insurance broker disagree over who said what to whom and when it was said. Consequently, there is a triable issue of material fact about whether the client requested the insurance broker to obtain insurance coverage before the fire.

In summary, the insurance broker established none of the three grounds presented in its motions for summary judgment and those motions should have been denied.

We therefore reverse the judgment.

## FACTS

*The Parties*

Plaintiff AMCO Insurance Company (AMCO) is a corporation authorized to engage in the business of insurance. AMCO insured commercial property owned by David Saari and located at 289 South Washington Street, Sonora, California.

Plaintiffs Hideyo Ogawa and Myong Echols (Restauranteurs) owned and operated a restaurant at 293 South Washington Street, in Sonora, that did business as Koto Japanese Restaurant. For purposes of this opinion, "plaintiffs" refers to AMCO and Restauranteurs collectively.

---

[1]    In phrasing the issue, we have succumbed to the temptation of using traditional, nearly impenetrable legalese and, perhaps, have avoided the pitfall, identified by Groucho and Chico Marx, of trying something new and having people wonder if we know what we are doing. (See generally, Kimble, Lifting the Fog of Legalese: Essays on Plain Language (Carolina Academic Press 2006); see also, fn. 4, *post*, and accompanying text.)

3.

Defendant All Solutions Insurance Agency, LLC (Broker) is an insurance broker authorized to do business in California. Harish Kapur and Rajni Kapur are licensed insurance brokers, employees and owners of Broker.

*The fire*

On December 15, 2009, a fire started at 301 South Washington Street, a two-story building with an apartment above a restaurant, owned by Amarjit Singh (Singh). The fire started in an electrical panel box and was caused by Singh's negligence.

Singh suffered $491,088.47 in property damage. In addition, the fire damaged the neighboring properties owned by Saari and Restauranteurs. Singh tendered his first party claim and plaintiffs' third party claims to his insurance company, but the claims were denied because there was no policy in effect on the date of the fire.

*Lawsuits against Singh*

In 2010, Restauranteurs sued Singh for their property and business losses in Tuolumne County Superior Court. In November 2011, Singh stipulated to a judgment for $194,200.71, representing the damage to Restauranteurs' property and business interests. Singh also assigned to Restauranteurs his rights against Broker for failing to obtain fire insurance coverage for Singh's Property.

AMCO paid its insured, Saari, $371,326 and then filed a subrogation action against Singh. In November 2011, AMCO obtained a stipulated judgment against Singh for the amount paid. Singh also assigned to AMCO his rights against Broker for failure to obtain insurance.

*Singh's claims against Broker*

Before the fire, Singh received a notice of nonrenewal from his existing insurer. It is undisputed that Singh communicated with Broker's personnel—namely, Harish Kapur and Rajni Kapur—after receiving the notice and before the fire. Singh and Broker disagree over the substance of those communications.

4.

To summarize their positions, Singh asserts that he requested Rajni Kapur to obtain insurance before the fire and he believed the property was insured at the time of the fire. In contrast, Broker contends that Singh did not request Broker to obtain either first party property or third party liability insurance for the property. Broker contends that (1) two different quotations for insurance were communicated to Singh on December 10, 2009; (2) Singh was told that Broker would wait for his response before obtaining a policy; (3) Singh understood that he did not have insurance until he called Broker back with his decision; (4) Singh informed Broker that he would call back the following day with a decision; and (5) Singh did not provide Broker with his decision before the fire occurred.

The parties' dispute about their communications regarding insurance for Singh's property is discussed in more detail in part III of this opinion.

**PROCEEDINGS**

In December 2011, Restauranteurs filed a complaint against Broker in their capacity as assignees of Singh. A few days later, AMCO filed a separate lawsuit against Broker, also asserting rights as an assignee of Singh's causes of action against Broker. Plaintiffs subsequently amended their complaints. The operative pleadings are Restauranteurs' first amended complaint and AMCO's fourth amended complaint. The trial court ordered the two lawsuits consolidated based on a stipulation of the parties.

In December 2013, Broker filed separate motions for summary judgment against AMCO and Restauranteurs. The motion against AMCO asserted that (1) Broker's conduct did not fall below the standard of care of an insurance broker, (2) the assigned negligence cause of action was precluded by the rule of superior equities, and (3) the assigned negligence cause of action was not assignable. Broker's motion against Restauranteurs asserted the negligence and breach of contract causes of action had no merit because Broker's conduct did not fall below the standard of care of an insurance broker and the causes of action were not assignable.

5.

On July 2, 2014, following a hearing, the trial court filed two orders granting Broker's motions for summary judgment and directing the entry of judgment in favor of Broker. The court granted the motions for the same reason, stating that "the case of *Dobbas v. Vitas* (2011) 191 Cal.App.4th 1442 [(*Dobbas*)] is controlling based on the undisputed material facts herein, such that the action has no merit and there is no triable issue of material fact."

The trial court's order relating to AMCO also stated that (1) as an insurer, AMCO's "rights are ultimately proscribed by equitable principles rather than the basics of assignment"; (2) AMCO, even as an assignee of an individual, was required to first establish an equitable right to subrogation that was superior in position to that of the party to be charged—namely, Broker; and (3) AMCO could not prove it was entitled to equitable subrogation because its loss was not caused by Broker's failure to maintain the policy, but by the fire, the fire being the very risk that AMCO assumed.

Similarly, in granting summary judgment against Restauranteurs, the trial court concluded Restauranteurs, as assignees of Singh, had to establish an equitable right to subrogation that was superior in position to the position of Broker. The court concluded Restauranteurs could not establish the required superior position because "it is undisputed that the [loss of the Restauranteurs'] building was caused not by [Broker], but by a fire for which the assignor (Singh) was responsible."

AMCO and Restauranteurs filed a timely notice of appeal.

## DISCUSSION

Broker presents two different legal theories to support its contention that the contractual assignments of Singh's causes of action against it are invalid. First, Broker contends that the general rule allowing the assignment of causes of action should not be applied to causes of action against an insurance broker or agent. Second, Broker contends that if claims against insurance brokers and agents usually are assignable, the rule of superior equities from California's subrogation doctrine invalidates the

6.

assignment to these particular plaintiffs, whose equitable position is not superior to Broker's.

We address Broker's broader nonassignability argument first, even though it was not reached or addressed by the trial court, because the law governing assignability provides background for the subsequent discussion of equitable subrogation.

I.      ASSIGNABILITY OF CLAIMS AGAINST INSURANCE BROKERS

       A.      The Causes of Action against Broker

California recognizes the general rule that an agent or broker who intentionally or negligently fails to procure insurance as requested by a client—either an insured or an applicant for insurance—will be liable to the client in tort for the resulting damages. (*Saunders v. Cariss* (1990) 224 Cal.App.3d 905, 909.)  Also, a breach of contract cause of action arises where the agent or broker breaches an oral agreement to obtain insurance as requested by the client.  (*Ibid*.)

In this case, Restauranteurs are assignees of Singh's claims against Broker and their first amended complaint alleges causes of action for negligence and breach of contract against Broker.  AMCO also is an assignee of Singh and AMCO's fourth amended complaint alleges a negligence cause of action against Broker.

       B.      Contentions of the Parties

Broker contends that California law should prohibit the assignment of a client's causes of action against an insurance broker or agent.  Broker's contention, if accepted, would justify upholding the summary judgment in favor of Broker as to both AMCO and Restauranteurs.

Broker acknowledges that Division Two of the Fourth Appellate District held that an insured's negligence claim against an insurance broker could be assigned.  (*Troost v. Estate of DeBoer* (1984) 155 Cal.App.3d 289, 297 (*Troost*).)  However, Broker argues that *Troost* is over 30 years old and should not be followed.  Instead, Broker urges this

7.

court to treat causes of action against an insurance broker in the same manner as malpractice causes of action against an attorney and conclude the causes of action are not assignable. (See *Fireman's Fund Ins. Co. v. McDonald, Hecht & Solberg* (1994) 30 Cal.App.4th 1373, 1378-1380 (*Fireman's Fund*) ["legal malpractice claims are generally not assignable"].)

In response, AMCO and Restauranteurs contend we should follow *Troost* and argue that Broker's analogy to legal malpractice actions is inapt because the rationale for holding legal malpractice claims are not assignable is the fiduciary nature of the attorney-client relationship and no such relationships exist in the insurance brokerage context.

C.   Basic Principles Regarding the Assignment of Causes of Action

   1.   *Common Law*

At common law, California followed the English and American approach that, as a general rule, causes of action were assignable and that nonassignability, the exception, was "'confined to wrongs done to the person, the reputation, or the feelings of the injured party, and to contracts of a purely personal nature, like promises of marriage.'" (*Rued v. Cooper* (1893) 109 Cal. 682, 693.) These common law principles are not the final word on the subject because the Legislature has addressed the assignment of causes of action.

   2.   *Assignment Statutes*

Civil Code section 953 defines a "thing in action" as "a right to recover money or other personal property by a judicial proceeding." A "thing in action" refers to a cause of action. (*Amalgamated Transit Union, Local 1756, AFL-CIO v. Superior Court* (2009) 46 Cal.4th 993, 1001.)

Civil Code section 954 addresses assignability by stating: "A thing in action, arising out of the violation of a right of property, or out of an obligation, may be transferred by the owner." The term "obligation" is defined to mean "a legal duty, by which a person is bound to do or not to do a certain thing." (Civ. Code, § 1427.)

8.

### 3. *Case Law Explaining and Applying the Statutes*

The California Supreme Court has discussed the relationship between the common law and these statutes by stating that "sections 953 and 954 of the Civil Code have lifted many of the restrictions imposed by the rule of the common law upon th[e] subject [of the assignability of causes of action]." (*Wikstrom v. Yolo Fliers Club* (1929) 206 Cal. 461, 464 (*Wikstrom*).) The court reiterated this point by stating: "That these statutes were intended to liberalize the common-law rule was expressly held in *Morris v. Standard Oil Co.* [(1926)] 200 Cal. 210, 214 …." (*Id.* at p. 464.)

In *Wikstrom*, the court confirmed the assignability of a purchaser's cause of action for fraud that alleged a misrepresentation about the number of acres being sold. (*Wikstrom*, *supra*, 206 Cal. at p. 464.) The court applied the statutory text as follows:

> "There can be little doubt that the cause of action set forth in the complaint here is a 'thing in action,' under said section 953, and arises 'out of the violation of a right of property,' under said section 954, and is expressly made assignable and declared to survive the death of the owner by the latter statute." (*Wikstrom*, *supra*, 206 Cal. at p. 464.)

More recently, the California Supreme Court stated: "A cause of action is transferrable, that is, assignable, by its owner if it arises out of a legal obligation or a violation of a property right. (Civ. Code, § 954.)" (*Amalgamated Transit Union, Local 1756, AFL-CIO v. Superior Court, supra,* 46 Cal.4th at p. 1003.)

An example of the assignability of a cause of action against an insurance company is provided by *Brown v. Guarantee Ins. Co.* (1957) 155 Cal.App.2d 679 (*Brown*). In that case, the insurance company had wrongfully refused to settle an automobile accident personal injury claim against the insured. The court stated "that the very basis of the insured's cause of action is the damage that he is forced to suffer because of the insurer's wrongful act. The act strikes the insured in his pocketbook and diminishes his estate [citation]; it does not harm his person or his personality." (*Id.* at p. 695.) The court concluded the insured's cause of action for the wrongful refusal to settle was assignable,

regardless of whether that cause of action was based on contract or tort. (*Ibid*.) The court supported this conclusion by stating, "The modern trend in favor of assignability dispels any remaining doubts concerning the transferability of the insured's claim." (*Ibid*.)

### 4. *The Exceptions to the General Rule of Assignability*

Under California law, the exceptions to the general rule favoring assignability of causes of action include tort causes of action for wrongs done to the person, the reputation or the feelings of an injured party. (7 Cal.Jur.3d (2011) Assignments, § 5, pp. 14-15 [causes of action for slander, assault and battery, negligent personal injuries, seduction, breach of marriage promise, and malicious prosecution are not assignable].) One basis for distinguishing between assignable and nonassignable tort causes of action relates to whether that cause of action survives the death of the injured party. (*Id*. at p. 17.) Actions that survive death are assignable. (*Ibid*.)

Other exceptions include legal malpractice claims and certain types of fraud claims. (7 Cal.Jur.3d, *supra*, Assignments, §§ 6-9, pp. 17-22.) The rule that a cause of action for legal malpractice is not assignable is based on a number of public policy reasons, including protecting the attorney-client relationship. (*Fireman's Fund*, *supra*, 30 Cal.App.4th at p. 1379.) "This view is predicated on the uniquely personal nature of legal services and the contract out of which a highly personal and confidential attorney-client relationship arises." (7 Cal.Jur.3d, *supra*, Assignments, § 6, p. 18.)

### D. Application of Principles

In *Troost*, the court applied the general rule and concluded that a negligence claim against an insurance broker who failed to procure insurance was assignable. (*Troost*, *supra*, 155 Cal.App.3d at p. 297.) The court explicitly considered whether the exception for legal malpractice claims should be extended to claims against an insurance broker. (*Ibid*.) The court referred to the unique quality of legal services, the personal nature of

10.

the attorney's duty to the client and the confidentiality of the attorney-client relationship and concluded those factors were not present in the client-broker relationship before it. (*Ibid.*)  As a result, the court declined to expand the exception.

Broker disagrees with the rationale in *Troost*, arguing that "the reasons for prohibiting assignment of legal malpractice claims are equally applicable to assignment of insurance broker malpractice claims."  We reject this argument and are persuaded by the analysis in *Troost* of the dissimilarities in the relationships.  Among other things, communications between a client and an insurance broker are not protected by a privilege of confidentiality and, given the standardized nature of insurance policies, the product ultimately delivered to the client cannot be regarded as *highly or uniquely* personal.

Our conclusion that a client's causes of action against an insurance broker are assignable is consistent with the majority view.  In *DC-10 Entertainment, LLC v. Manor Insurance Agency, Inc.* (Colo.App. 2013) 308 P.3d. 1223, the court cited a number of cases and concluded that a majority of jurisdictions "that have addressed an insured's assignment of negligence claims against an insurance broker or agent have found such assignments valid."  (*Id.* at p. 1228.)  Thus, Broker's suggestion that *Troost* is antiquated is at odds with current developments.

In summary, we conclude that Singh's negligence cause of action against Broker is assignable under California law.  Therefore, the summary judgments granted in favor of Broker cannot be affirmed on the ground that Singh's cause of action was not assignable.

II.    EQUITABLE SUBROGATION AND SUPERIOR EQUITIES

A.    Legal Context Provided by General Rule of Assignability

The foregoing discussion of assignability provides the broader legal context into which we must fit Broker's arguments about equitable subrogation.  We refer to this legal context as broad because, under the general rule of assignability, Singh could have

11.

assigned his cause of action against Broker to nearly anyone in the world and that assignee would have been allowed to pursue the cause of action in a judicial proceeding. (See Civ. Code, § 954.)

Viewed from the perspective of the general rule of assignability, Broker's arguments are an attempt to use the common law doctrine of equitable subrogation to negate or override the application of that general rule *to these particular plaintiffs*. In effect, Broker is arguing that, while any other assignee in the world could pursue Singh's cause of action against it, AMCO and Restauranteurs should be barred from pursuing that cause of action. Broker's reason for treating AMCO and Restauranteurs differently from all other potential assignees is their closeness to the alleged wrong—they were an insurance company and fire victims affected by Broker's allegedly negligent failure to obtain insurance for Singh. Broker's approach, which creates two classes of assignees and treats the smaller, interested class less favorably,[2] would be difficult to justify in the absence of the precedent established in *Meyers v. Bank of America etc. Assn.* (1938) 11 Cal.2d 92 (*Meyers*).

In *Meyers*, the California Supreme Court concluded that "a formal, written assignment of a claim [that also was transferred by operation of law under equitable subrogation doctrine] adds nothing to the enforceability by the assignee of the cause of action [and] it is subject to the same defenses as though no assignment thereof of any sort had been made." (*Meyers*, *supra*, 11 Cal.2d at p. 94.) The court then quoted a legal encyclopedia for the statement that "'it seems that, if the surety is *not entitled to subrogation*, an assignment by the creditor will be ineffectual to give the surety a right of subrogation he would not otherwise have.' (Italics added.)" (*Id*. at p. 95.) Simply put, when the doctrine of equitable subrogation and the law governing contractual

_____

**2** AMCO and Restauranteurs have not argued, and we do not address, whether the creation of two classes of assignees violates equal protection because there is no rational basis for the treating the two classes differently.

12.

assignments apply to the same potential/attempted transfer, our Supreme Court concluded the equitable subrogation doctrine trumps contract law. The court's discussion of its conclusion did not address certain consequences resulting from the rule of law adopted—consequences that are difficult to square with the policies and rationale underlying the general rule of assignability. Specifically, the court did not acknowledge that it was creating two classes of assignees and provide a rationale for why the assigned cause of action should be unenforceable when held by a surety yet enforceable when held by other assignees. Despite the absence of an explanation for the creation of two classes of assignees, we recognize that, insofar as it goes, the rule of law adopted by the Supreme Court in *Meyers* is binding on this court. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455 [binding effect of Supreme Court precedent].)

A second way to view Broker's argument is from the perspective of statutory interpretation. From this perspective, Broker's arguments amount to a request that this court interpret Civil Code section 954 by engrafting certain equitable principles onto the statutory text and thereby narrowing the reach of the statute. Such an approach to statutory interpretation seems contrary to the Supreme Court's statement that Civil Code sections 953 and 954 were intended to liberalize the common law and lifted many of its restrictions on the assignability of causes of action. (*Wikstrom*, *supra*, 206 Cal. at p. 464.) We note that, in *Meyers*, the Supreme Court did not mention Civil Code sections 953 and 954 or address how limiting contractual assignments by extending the rules of equitable subrogation is compatible with the language of those statutes.

The foregoing considerations about the general rule of assignability, and the statutory text creating that rule, explain some of our reluctance to limit assignability by taking an expansive approach to equitable subrogation's rule of superior equities. (See *Fort Bragg Unified School Dist. v. Colonial American Casualty & Surety Co.* (2011) 194 Cal.App.4th 891, 915-916 [other criticisms of the superior equities rule].)

13.

B.     Overview of Equitable Subrogation

    1.     *Basic Principles*

Subrogation is a legal device or fiction that permits the substitution of one party in the place of another as a possessor of a tort or other rightful claim against a third party. (58 Cal.Jur.3d (2012) Subrogation, § 1, p. 659.)  In the insurance context, this substitution occurs because the insurer-subrogee[3] has paid for losses experienced by the policyholder-subrogor as the result of a third party's wrongful act; subrogation allows the insurer to step into the shoes of the injured policyholder and pursue recovery from the third party wrongdoer.  (*Ibid.*; 39A Cal.Jur.3d (2014) Insurance Contracts, § 713, p. 665 [right to subrogation].)

The goal of subrogation is to place the burden for a loss on the party ultimately liable or responsible for it and to relieve entirely the party who paid the loss and who in equity is not primarily liable for it.  (58 Cal.Jur.3d, *supra*, Subrogation, § 3, p. 663.) Therefore, the substitution resulting from subrogation provides a method of compelling the ultimate payment by one who in justice and good conscience ought to bear financial responsibility.  (58 Cal.Jur.3d, *supra*, Subrogation, § 2, p. 662.)

Generally speaking, "subrogation" has its source in equity and arises by operation of law, but the term can also be used to describe a relationship that arises from contract or a statute.  (58 Cal.Jur.3d, *supra*, Subrogation, § 1, p. 660; 39A Cal.Jur.3d, *supra*, Insurance Contracts, § 716, p. 668.)  This lack of specificity in the use of the term "subrogation" and subrogation's overlapping relationships with other areas of law caused one court to state, "It is hard to imagine another set of legal terms with more soporific

---

**3**     The term "subrogee" is defined by Black's Law Dictionary (9th ed. 2009) at page 1564 as follows:  "One who is substituted for another in having a right, duty, or claim; esp., the person or entity that assumes the right to attempt to collect on another's claim against a third party by paying the other's claim-related debts or expenses.  An insurance company frequently becomes a subrogee after paying a policy claim, as a result of which it is then in a position to sue a tortfeasor who injured the insured or otherwise caused harm."

14.

effect than indemnity, subrogation, contribution, co-obligation and joint tortfeasorship."
(*Herrick Corp. v. Canadian Ins. Co.* (1994) 29 Cal.App.4th 753, 756.)[4]

> 2.    *Relationship to Assignment*

In this appeal, the pertinent overlapping relationship involves the terms "subrogation" and "assignment." "Subrogation has been called a sort of assignment by operation of equity and the equivalent of an equitable assignment. Conversely, voluntary assignment has been deemed a kind of subrogation." (58 Cal.Jur.3d, *supra*, Subrogation, § 4, pp. 663-664 (fns. omitted); see *Offer v. Superior Court* (1924) 194 Cal. 114, 117 [subrogation described as substitution or equitable assignment].) Thus, the broadest usage of the term "subrogation" includes transfers of causes of action that are implemented by either (1) contract, which is a consensual arrangement, or (2) operation of law without the consent of the owner of the cause of action. (58 Cal.Jur.3d, *supra*, Subrogation, § 4, pp. 663-664.)

This opinion seeks to avoid the ambiguity in the broad term "subrogation" and its potentially confusing overlap with contractual relationships by using the term "equitable subrogation" to refer to the transfer of rights against a third party that arises in equity and occurs *only* by operation of law because a party (i.e., the subrogee) has paid a loss of another (i.e., the subrogor). (See 58 Cal.Jur.3d, *supra*, Subrogation, § 5, pp. 665-666 [no written or oral assignment is necessary].) In contrast, we use the term "contractual assignment" to refer to the transfer of rights based on a voluntary agreement between the

---

[4]    This quote continues: "Perhaps because the words describe legal relationships between multiple parties, they are vaguely reminiscent of complex mathematical equations which, after all, also describe relationships, except in numbers rather than words-and for most of us, they are about as easy to understand. Even lawyers find words like 'indemnity' and 'subrogation' ring of an obscure Martian dialect." (*Herrick Corp. v. Canadian Ins*. *Co*., *supra,* 29 Cal.App.4th at p. 756.)

party transferring the rights (i.e., the assignor) and the party receiving the rights (i.e., the assignee).[5]

### 3. Equitable Subrogation for Insurers

The most common equitable subrogation action is one brought by an insurer against a wrongdoer whose wrong caused the loss paid by the insurer. (*Patent Scaffolding Co. v. William Simpson Constr. Co.* (1967) 256 Cal.App.2d 506, 512 (*Patent Scaffolding*).) In other words, the first-party insurer pays its insured for its losses, then sues the third-party tortfeasor to recover the costs paid. When an insurer pursues a cause of action based on equitable subrogation, it must prove the following elements:

> "(1) The insured has suffered a loss for which the party to be charged is liable, either because the latter is a wrongdoer whose act or omission caused the loss or because he is legally responsible to the insured for the loss caused by the wrongdoer; (2) the insurer, in whole or in part, has compensated the insured for the same loss for which the party to be charged is liable; (3) the insured has an existing, assignable cause of action against the party to be charged, which action the insured could have asserted for his own benefit had he not been compensated for his loss by the insurer; (4) the insurer has suffered damages caused by the act or omission upon which the liability of the party to be charged depends; (5) justice requires that the loss should be entirely shifted from the insurer to the party to be charged, whose

---

[5] In *State Farm General Ins. Co. v. Wells Fargo Bank, N.A.* (2006) 143 Cal.App.4th 1098 (*State Farm*), the court referred to the transfer of rights between an insurance company and its insured pursuant to contractual language in the insurance policy as "conventional subrogation." (*Id*. at p. 1106.) The court subsequently addressed the distinction between equitable subrogation and conventional (i.e., contractual) subrogation by stating: "In California, however, this is a distinction without a difference. California, along with other jurisdictions, has adopted the superior equities doctrine in all cases of equitable or conventional subrogation. (See *Meyers*, *supra*, 11 Cal.2d at pp. 101-103; ….)" (*State Farm*, *supra*, at p. 1109.) Based on the facts of that case and the court's many references to the relationship between an insurer and its insured, we conclude that the term "conventional subrogation" describes transfers between an insurer and its insured—the entities that form the most common type of subrogee-subrogor relationship. Thus, we do not read "conventional subrogation" as encompassing contractual assignments between an insurance company and a judgment debtor-assignor who was not an insured. Based on this reading, we do not believe our decision conflicts with the analysis adopted in *State Farm*.

equitable position is inferior to that of the insurer; and (6) the insurer's damages are in a stated sum, usually the amount it has paid to its insured, assuming the payment was not voluntary and was reasonable." (*Patent Scaffolding*, *supra*, 256 Cal.App.2d at p. 509.)

The fifth element reflects the rule of superior equities, which holds that the right of equitable subrogation "may be invoked against a third party only if that party is guilty of some wrongful conduct which makes the party's equity inferior to that of the surety or insurer." (39A Cal.Jur.3d, *supra*, Insurance Contracts, § 716, p. 669.) It is the difference in equities that provide the reason for shifting the entire financial burden of paying for the loss. (*State Farm, supra,* 143 Cal.App.4th at p. 1121.)

The rule of superior equities encompasses the "compensated surety defense," which is based on the idea that the insurer has been compensated (by receipt of premiums) for issuing the policy and should not be allowed to shift the very loss contemplated by the policy to an innocent party, even though that party, as between itself and the insured, would be absolutely liable. (*State Farm*, *supra*, 143 Cal.App.4th at p. 1121; see *Mutual Service Cas. Ins. Co. v. Elizabeth State Bank* (7th Cir. 2001) 265 F.3d 601, 625, 628 [predicting Illinois Supreme Court would not recognize compensated surety defense in cases of "contractual subrogation"].)

Bearing in mind the foregoing overview of the law of equitable subrogation, we turn to the question whether the principles of equitable subrogation apply to limit the rights AMCO and Restauranteurs attempted to obtain from Singh through a voluntary assignment.

C.      Restauranteurs Are Not Subject to Equitable Subrogation Principles

Restauranteurs contend the rule of superior equities has no application to them because they were never subrogees. We agree.

17.

### 1. *Restauranteurs' Roles*

Our analysis of whether Restauranteurs are subject to the principles of equitable subrogation begins with a description of the seven roles that Restauranteurs have played so far in connection with this litigation. Those roles, in chronological order, are (1) business owners and operators; (2) fire victims; (3) plaintiffs in a lawsuit against Singh, the person whose negligence caused the fire; (4) judgment creditors of Singh; (5) contractual assignees of Singh's rights against Broker; (6) plaintiffs in a lawsuit against Broker; and (7) appellants before this court. At no time were Restauranteurs an insurer or surety. As a result, they never became equitable subrogees.

### 2. *Issue*

The legal question presented is whether Restauranteurs' rights as contractual assignees of Singh's cause of action against Broker are limited by equitable subrogation doctrine—specifically, the rule of superior equities.[6]

### 3. *Rule of Law*

In certain situations, California courts have applied the principles of equitable subrogation to bar a contractual assignee from pursuing the assigned cause of action. (E.g., *Meyers*, *supra*, 11 Cal.2d 92; *Dobbas, supra,* 191 Cal.App.4th 1442.) Therefore,

---

[6] At oral argument, counsel for Broker argued that Restauranteurs had waived the argument that they were not subrogees because Restauranteurs did not raise that point below. We reject this waiver argument because, in the factual context of this case, Restauranteurs' argument that they were assignees implies that they were not equitable subrogees. Therefore, we find Restauranteurs did not intend to waive (i.e., intentionally relinquish or abandon) the argument that they were not equitable subrogees. (See *Smith v. Adventist Health System/West* (2010) 182 Cal.App.4th 729, 745 [waiver is a question of fact based on intent].) Alternatively, in conducting our independent review of the motion for summary judgment, we may consider an issue not raised below when it involves a question of law relating to undisputed facts and has been briefed by the parties. (*Noe v. Superior Court* (2015) 237 Cal.App.4th 316, 335-336.) Therefore, we will consider Restauranteurs' argument that they are not subrogees.

18.

we must determine if Restauranteurs' situation is one of those where the principles of equitable subrogation act as a bar to the assigned cause of action.

In *Dobbas*, the insured owned a bull that escaped from a pasture and caused an automobile accident in which two people were killed. (*Dobbas*, *supra*, 191 Cal.App.4th at p. 1447.) The bull owner had a primary liability insurance policy for $1 million in coverage, believed he had an excess liability insurance policy for an additional $3 million in coverage, and had another excess liability insurance policy from American Guarantee in the amount of $7 million. (*Ibid*.) At the time of the accident, the $3 million excess liability policy was not in effect because the bull owner's insurance agent, Vitas, had either cancelled or failed to renew it. (*Ibid*.) In the ensuing litigation over the auto accident, American Guarantee paid the accident victims $2.8 million and, as part of the settlement, received their assignment of the bull owner's claim against his insurance agent, which the bull owner previously had assigned to the accident victims. (*Id*. at p. 1448.)

After American Guarantee received the assignment, it moved to intervene in the lawsuit originally filed by the bull owner against his insurance agent. (*Dobbas*, *supra*, 191 Cal.App.4th at p. 1448.) The trial court denied the motion on the grounds that American Guarantee was not entitled to equitable subrogation against the insurance agent because American Guarantee's loss was not caused by the agent's failure to maintain the $3 million excess liability policy, but was caused by the accident, which was the very risk American Guarantee had assumed by issuing its policy to the bull owner. (*Ibid*.) The appellate court affirmed the trial court's order. (*Id*. at p. 1456.)

The appellate court analyzed American Guarantee's rights to proceed against the insurance agent (1) as an equitable subrogee and (2) as a contractual assignee. With respect to equitable subrogation, the court concluded American Guarantee's equitable position was not superior to the insurance agent's position and, thus, justice did not require the loss to be shifted entirely from American Guarantee to the insurance agent.

19.

(*Dobbas*, *supra*, 191 Cal.App.4th at p. 1454.) The court explained its conclusion by stating: "Here, American Guarantee contracted to provide insurance to [the bull owner] that covered the accident in question. The fact that [the insurance agent] failed to obtain insurance that also would have covered the accident, does not create in American Guarantee an equity superior to [the insurance agent]." 14(*Ibid.*) American Guarantee's equitable position was not superior to the insurance agent's because, if the $3 million excess liability policy had been in place, both that policy and American Guarantee's policy would have been available to satisfy a judgment against the bull owner and, accordingly, American Guarantee still would have been legally responsible for its pro rata share of damages. (*Id.* at pp. 1453-454.) As a result, American Guarantee was barred from pursuing an equitable subrogation claim against the insurance agent.

The court also considered whether American Guarantee could proceed in the action based on the contractual assignment, which gave it ownership of the bull owner's claims against the insurance agent for failure to secure excess insurance. (*Dobbas*, *supra*, 191 Cal.App.4th at p. 1455.) The court concluded any contractual right American Guarantee had to recover from the insurance agent was limited by the principles of equitable subrogation, quoting *Meyers, supra,* 11 Cal.2d 92, for the principle that

> "'where by the application of equitable principles, a surety has been found not to be entitled to subrogation, an assignment will not confer upon him the right to be so substituted in an action at law upon the assignment. His rights must be measured by the application of equitable principles in the first instance, his recovery being dependable upon a right in equity, and not by virtue of an asserted legal right under an assignment.' (*Id.* at p. 97.)" (*Dobbas*, *supra*, at p. 1455.)

Thus, *Meyers* and *Dobbas* are cases where the courts applied principles from equitable subrogation doctrine to limit a contractual assignment of a cause of action. We read these cases as limiting contractual assignments only if the assignee is "a surety … found not to be entitled to subrogation." (*Meyers*, *supra*, 11 Cal.2d 97.) In other words, when the assignee-assignor relationship is a potential subrogee-subrogor relationship

20.

under the doctrine of equitable subrogation, that assignee-assignor relationship is subject to the principles of equitable subrogation.

### 4. Application of Rule

Based on this reading of *Meyers* and *Dobbas*, we conclude that the principles of equitable subrogation do not extend to situations where the contractual assignee was not a surety and does not occupy the role of potential equitable subrogee. The practical impact of *Meyers* and *Dobbas* is that a surety in the position of a subrogee cannot avoid the principles of equitable subrogation by obtaining an assignment of the cause of action to bolster its position. Therefore, when the contractual assignee is not a potential subrogee, the limitation recognized in *Meyers* and *Dobbas* does not apply and the assignees fall under the general rule that causes of action are assignable.

Here, Restauranteurs were not sureties and no payments, akin to the type of payment a surety would make on behalf of another, were made. Therefore, they had no possibility of pursuing a claim for equitable subrogation, much less an equitable subrogation claim that replicated the contractually assigned cause of action against Broker. Consequently, we conclude the limitation on contractual assignments recognized in *Meyers* and *Dobbas* does not apply to Restauranteurs. It follows that the order granting Broker's motion for summary judgment against Restauranteurs cannot be upheld on the ground that equitable subrogation requires Restauranteurs' position to be equitably superior to the position of Brokers.[7]

---

[7] We note that, in any event, Restauranteurs are in an equitable position that is superior to Brokers because Restauranteurs are (1) innocent of any fault and (2) did not agree or otherwise undertake to assume the risk of the fire. In contrast, if plaintiffs prevail on their claim, Brokers will have been proven to be at fault, which fault relates to aiding Singh in transferring the risk of fire from himself to an insurance company.

D.    AMCO Is Not Subject to Equitable Subrogation Principles

1.    *AMCO's Roles*

As with Restauranteurs, our analysis of whether AMCO's claims are subject to the principles of equitable subrogation begins with a description of the roles AMCO has played in this litigation. Those roles, in chronological order, are (1) insurer of fire victim; (2) payor of the losses of Saari—its policyholder and a victim of the fire; (3) equitable subrogee of Saari's claims against Singh, whose negligence caused the fire; (4) plaintiff in a lawsuit against Singh; (5) judgment creditor against Singh; (6) contractual assignee of Singh's rights against Broker; (7) plaintiff in a lawsuit against Broker; and (8) appellant before this court. Therefore, in contrast to Restauranteurs, AMCO once occupied the role of equitable subrogee.

2.    *Issue*

Accordingly, the legal issue presented by AMCO's situation is slightly different from the issue involving Restauranteurs. The issue can be phrased many ways, including the following: Should the principles of equitable subrogation that governed the subrogee-subrogor relationship that AMCO had with its insured, Saari, also apply to AMCO's assignee-assignor relationship with Singh? We conclude those principles do not extend to that assignee-assignor relationship.

3.    *Application of Equitable Limitations to Contractual Assignment*

AMCO contends that its subrogation cause of action was against Singh and not Broker and, therefore, the limitations contained in the equitable subrogation doctrine do not apply to the assignment. In AMCO's view, (1) its subrogation claim ended when it obtained a judgment against Singh and (2) the assignment in question was made in partial satisfaction of that judgment. Therefore, AMCO contends the assigned cause of action against Broker is not a subrogation claim or duplicative of AMCO's prior subrogation claim against Singh.

22.

In this case, AMCO had a subrogee-subrogor relationship with its insured, Saari. AMCO did not have a subrogee-subrogor relationship with Singh. Therefore, based on our reading of *Meyers* and *Dobbas*, we conclude that the contractual assignment of Singh's cause of action against Broker is not subject to the principles of equitable subrogation. We have found no convincing policy reasons for extending the principles of equitable subrogation down the chain of relationships that can arise after an insurer has successfully pursued its rights as an equitable subrogee. Furthermore, the policies underlying the general rule of assignability and the relevant statutory text convinces us not to take language from *Meyers* and *Dobbas* out of context and create a new exception to the general rule of assignability.

### 4. Equitable Positions of AMCO and Broker

As an alternate and separate ground for reversing the summary judgment granted against AMCO, we assume that the rule of superior equities applies to the contractual assignment of Singh's cause of action against Broker to AMCO, and conclude that Broker has failed to establish its equitable position was equal or superior to AMCO's equitable position.

The question of how a court should identify and compare the equitable positions of two litigants was answered by the analysis employed by the court in *Dobbas*. There, the court (1) identified how the losses for the automobile accident would have allocated if the insurance agent had not committed the alleged wrong—that is, had not cancelled or failed to renew the bull owner's policy for $3 million in excess liability coverage—and (2) compared that allocation of the losses with how those losses would be borne if the court barred the claim against the insurance agent. (*Dobbas*, *supra*, 191 Cal.App.4th at pp. 1454-1455.) The *Dobbas* court's method of analysis is useful to our consideration of Broker's motion for summary judgment because that method shows which facts are "material" to the application of the rule of superior equities and, thus, which facts Broker,

23.

as moving party, must show are undisputed to carry its initial burden in moving for summary judgment. (See Code Civ. Proc., § 437c, subd. (c) [moving papers must show "no triable issue as to any material fact"].)

Here, Broker's separate statement in support of its motion for summary judgment against AMCO sets forth 21 enumerated facts that Broker contended were undisputed and established AMCO's negligence cause of action was precluded by the rule of superior equities. Those 21 enumerated facts made no attempt at showing how the fire losses would have been allocated if Broker had obtained insurance for Singh. As a result, we are unable to determine if the insurance that Broker's allegedly should have obtained would have covered Saari's losses. Also, we are unable to determine how the unobtained coverage would have related to the coverage provided by AMCO to its insured (Saari) and whether AMCO would have paid all of the losses, none of the losses, or (like the insurance companies in *Dobbas*) a pro rata share of the losses. Without these material facts, we are unable to balance the equities and reach a conclusion about the relative equities of AMCO's position and Broker's position. (See *Troost*, *supra*, 155 Cal.App.3d at p. 297 [insurer that paid for damages relating to a gap in the insured's coverage had an equitable position superior to the insurance agent whose negligence caused the gap in coverage].)

Broker's appellate brief argues AMCO does not have an equitable position superior to its own and implies that the information described in the foregoing paragraph is not material to deciding the equities of this case. As in the trial court, Broker has not explicitly addressed which facts it regards as "material" to the examination of the equities of each party's position. Nonetheless, Broker's argument about the equities refers to three facts—(1) the fire was not caused or spread by Broker; (2) Broker did not itself agree to indemnify anyone for the loss; and (3) the insurance that it allegedly failed to obtain for Singh might have covered Saari's fire losses. Therefore, Broker's argument implies that these are the only "material" facts it needed to establish AMCO's equitable

24.

position was not superior to its position.  We disagree with this implied argument about which facts are "material" to the analysis of the parties' equitable positions.  The court in *Dobbas* conducted a more detailed analysis of the facts about the unobtained insurance than that used by Broker and we do not regard those facts as legally *immaterial* to the question of equities.  (See *Troost*, *supra*, 155 Cal.App.3d at p. 297.)

Therefore, we conclude that Broker's separate statement omitted material facts and, as a result, Broker failed to carry its burden of making a prima facie showing that AMCO's cause of action would have been precluded by the rule of superior equities (assuming the rule applied to the assignment).  This omission of material facts provides a second ground for our conclusion that Broker is not entitled to the entry of judgment in its favor based on the rule of superior equities.[8]

III.    DISPUTE AS TO BROKER'S NEGLIGENCE[*]

The last ground Broker presents for affirming the judgment is that Broker's conduct did not fall below the standard of care of an insurance broker.  The trial court did not reach this ground.

A.    Standard of Review for Motions for Summary Judgment

Appellate courts independently review an order granting summary judgment. (*Saelzler v. Advanced Group 400* (2001) 25 Cal.4th 763, 768 (*Saelzler*).)  In performing this independent review, appellate courts apply the same three-step analysis as the trial court.  (*Brantley v. Pisaro* (1996) 42 Cal.App.4th 1591, 1607 (*Brantley*).)

---

[8]     The instant case provides yet another example of "the importance of … accurately identifying the facts material to the moving party's legal theory" (*Haney v. Aramark Uniform Services, Inc.* (2004) 121 Cal.App.4th 623, 632 (*Haney*)) and actually including those material facts in the separate statement.  (See pt. III.A.2, *post*.)

[*]     See footnote, *ante*, page 1.

## 1. Issues Framed by Pleadings and Material Facts

First, the court identifies the issues framed by the pleadings because the moving papers must show there is no factual basis for relief on any theory reasonably contemplated by the opponent's pleadings. (*AARTS Productions, Inc. v. Crocker National Bank* (1986) 179 Cal.App.3d 1061, 1064.) Stated from another perspective, the materiality of a disputed fact is measured by the pleadings, which set the boundaries of the issues to be resolved by the motion for summary judgment. (*Conroy v. Regents of University of California* (2009) 45 Cal.4th 1244, 1250.)

## 2. Moving Party's Showing—Facts and Evidence

Second, the court determines whether the moving party has satisfied its initial burden by making a prima facie showing of the nonexistence of any triable issue of material fact. (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850 (*Aguilar*).) The prima facie showing is made by (1) the facts set forth in the moving party's separate statement and (2) the supporting evidence referenced in that separate statement. (See Code Civ. Proc., § 437c, subd. (b)(1); Cal. Rules of Court, rule 3.1350(d).)

The facts set forth in the moving party's separate statement are sufficient to make the required prima facie showing when, standing alone and accepted as true, those facts require a favorable ruling for the moving party under the applicable rules of law.

If the facts stated in the moving party's separate statement are sufficiently complete to justify a ruling in its favor, the court then examines the referenced evidence to determine whether that evidence establishes, "either directly or by inference, the material fact that the moving party asserts is undisputed." (*Haney*, *supra*, 121 Cal.App.4th at p. 632.) Establishing a material fact is undisputed based on circumstantial evidence (i.e., by inference) can be difficult because, if more than one reasonable inference can be drawn from the evidence and those inferences are contradictory, a triable issue of fact exists. (Code Civ. Proc., § 437c, subd. (c).)

### 3. Opposing Party's Showing

Third, if the moving party has carried its initial burden, the court addresses whether the opposing party has demonstrated the existence of a triable issue of material fact. (*Brantley*, *supra*, 42 Cal.App.4th at p. 1602.) Courts performing this independent review, consider the evidence in a light favorable to the nonmoving party, liberally construing that party's evidentiary submission while strictly scrutinizing the moving party's own showing and resolving any evidentiary doubts or ambiguities in the losing party's favor. (*Saelzler*, *supra*, 25 Cal.4th at pp. 768-769.)

### B. Triable Issues of Material Fact

A motion for summary judgment "shall be granted if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." (Code Civ. Proc., § 437c, subd. (c).) A moving party is "entitled to a judgment as a matter of law" when it establishes by admissible evidence that the "action has no merit." (Code Civ. Proc., § 437c, subd. (a).) There is a triable issue of material fact if, and only if, the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof. (*Aguilar, supra,* 25 Cal.4th at p. 845.)

### C. Broker's Moving Papers

### 1. Facts Asserted in Separate Statement

Broker's contention that it did not breach the applicable standard of care was supported by a separate statement asserting the following facts were undisputed:

> "10. Before the fire, Singh did **not** request [Broker] obtain and maintain either property or liability insurance. [¶] [Citation to evidence.]

> "11. Singh did **not** request that [Broker] procure a certain amount of coverage for a certain premium. [¶] [Citation to evidence.]

> "12. [Broker] presented two different quotations for insurance to Singh on or about December 10, 2009. [¶] [Citation to evidence.]

27.

"13. Singh said he would call [Broker] back with his decision the following day. [¶] [Citation to evidence.]

"14. [Broker] specifically told Singh it would wait for his response before obtaining the policy. [¶] [Citation to evidence.]

"15. Singh understood he did not have insurance until he called [Broker] back with his decision. [¶] [Citation to evidence.]"

In response, AMCO's separate statement explicitly disputed Broker's fact No. 10 and Nos. 12 through 15 and stated that fact No. 11 was undisputed for purposes of the summary judgment motion.

### 2. Broker's Evidentiary Support for Fact No. 10

As supporting evidence for the undisputed fact No. 10, Broker refers to lines 9 through 14 of page 128 of Singh's December 6, 2013, deposition. Our quote from that deposition begins at the first line of page 128 because the pages of Singh's deposition submitted with Broker's moving papers jump from page 101 to page 128:

"Q. … that you had asked [Broker] to obtain and maintain first and third-party coverage for the property located at 301 South Washington Street, S[o]nora, California. Is that true?

"A. Why I ask for that?

"Q. I don't know.

"A. I have said in November that he will take care that.

"Q. This is what's alleged, is that sometime prior to December 15, 2009, you requested that Mr. Kapur, as your insurance broker, obtain and maintain first and third-party coverage for your property at 301 South Washington Street;[9] is that true?

"A. No, I didn't."

---

**9** This question was based on paragraph 13 of AMCO's fourth amended complaint, which states in full: "Prior to December 15, 2009, Amarjit Singh requested that his insurance broker, Harish Kapur, All Solutions Insurance LLC's employee, obtain and maintain first and third party coverage for the property located at 301 South Washington Street, Sonora, California."

28.

This last question and answer from Singh's deposition is the sole evidentiary basis listed in Broker's separate statement for the undisputed nature of fact No. 10.

D.     AMCO's Opposition

AMCO disputed Broker's fact No. 10 by asserting that "Singh requested Rajni Kapur to obtain insurance for Bombay Pizzeria two weeks prior to the fire."   AMCO supported this version of the facts by citing testimony from Singh's June 25, 2010, deposition and his February 2014 declaration.  Paragraph 7 of the declaration states:  "On December 10, 2009, Rajni Kapur advised that [s]he would obtain the insurance through Alliance Insurance for my property located at 301 So. Washington Street, Sonora, California."  In his June 2010 deposition testimony, Singh stated, "I spoke with them on 9th, Thursday" and "I told her to go and get the insurance over the telephone."

E.     A Triable Issue of Material Fact Exists

Broker attempts to establish that, before the fire, Singh did not request it to obtain and maintain either property or liability insurance by referring to Singh's deposition testimony about what he requested of Mr. Harish Kapur.  That testimony does not address what Singh requested Ms. Rajni Kapur to do.  Based on the evidence referred to by AMCO about Singh's telephone request to Rajni Kapur, we conclude there is a triable issue of material fact about what Singh requested Broker's employees to do and when that request was made.

Therefore, we conclude that the order granting Broker's motion for summary judgment cannot be upheld on the ground that Singh never ordered any insurance through Broker and, as a result, Broker's conduct did not breach the applicable standard of care.

**DISPOSITION**

The judgment is reversed. The trial court is directed to vacate its July 2014 orders granting the motions for summary judgment and enter a new order denying those motions.

Plaintiffs shall recover their costs on appeal.

_____
FRANSON, Acting P.J.

WE CONCUR:


_____
PEÑA, J.


_____
SMITH, J.